# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

———————

m 01-10538

———————

BURLINGTON NORTHERN & SANTA FE RAILWAY COMPANY;
CONSOLIDATED RAIL CORPORATION; CSX TRANSPORTATION, INC.;
KANSAS CITY SOUTHERN RAILWAY COMPANY;
NORFOLK SOUTHERN RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY,

Plaintiffs-
Counter Defendants-
Appellees,

VERSUS

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES,

Defendant-
Counter Claimant-
Appellant.

———————

Appeal from the United States District Court
for the Northern District of Texas

———————

April 4, 2002

Before SMITH and DEMOSS, Circuit Judges,
and DUPLANTIER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

———————

[*]District Judge of the Eastern District of
Louisiana, sitting by designation.

## I.

A union appeals an injunction issued under the Railway Labor Act ("RLA"). The six appellee railroad carriers have obtained, on summary judgment, an injunction against appellant Brotherhood of Maintenance of Way Employees ("BMWE") requiring it to give ten days' notice before initiating a "strike, work

stoppage, picketing or other self help" against any of the carriers. *Burlington N. & Santa Fe R.R. v. BMWE*, 143 F. Supp. 2d 672, 696 (N.D. Tex. 2001) (*"Burlington Northern"*). In that published Memorandum Opinion and Order, the district court provides an impressive and detailed evaluation of the facts and law and a persuasive explanation of its reasons for entering the injunction. Finding no error, we affirm, essentially on the basis of the district court's well-crafted opinion, except to the extent that we provide further analysis below.

As the district court found, the BMWE has a long history of launching strikes without warning, including many that are illegal under the RLA. *See id.* at 694 (finding that "[t]he court can, and does, infer from the facts thus found that BMWE has a pattern, practice, and policy of authorizing, encouraging, permitting, calling or engaging in strikes, work stoppages, picketing, and other self-help against plaintiffs and their subsidiaries over what BMWE claims are unilateral changes in agreements . . . . [T]he conduct of the BMWE in engaging in activities of that kind without giving the affected carrier advance notice . . . violate[s] BMWE's duties under § 152 First."). Since 1993, "BMWE has struck, attempted to strike, or threatened to strike plaintiffs at least eighteen times, including nine cases in which pickets went up and/or operations were disrupted until the affected plaintiff was able to obtain a temporary restraining order." *Id.* at 679.

In the year preceding the injunction, "BMWE . . . accelerated its practice of strikes against the plaintiffs, with four incidents" between February 2000 and early 2001. *Id.* "In each case, BMWE planned its strike in secret and made every effort to implement the strike before the affected carrier could obtain a temporary restraining order." *Id.*[1]

BMWE claims that its policy of surprise strikes does not violate the RLA and that the injunction is forbidden by the Norris-LaGuardia Act ("NLGA"). We conclude that the BMWE's actions violated its duties under the RLA and that the NLGA does not bar an injunction under the specific circumstances of this case.

II.

A.

We first consider the BMWE's duties under the RLA. It is well established that "the major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes." *Tex. & New Orleans R.R. v. Bhd. of Ry. & Steamship Clerks*, 281 U.S. 548, 565 (1930) (quotations omitted). To further this goal, § 152 First of the RLA comprehensively requires that labor and management "exert *every* reasonable effort . . . to settle *all* disputes . . . in order to avoid *any* interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First (1994) (emphasis added). "[T]he obligation under § [152] First is central to the effective working of the Railway Labor Act," and compliance

---

[1] The district court made these factual findings without an evidentiary hearing; it provides a detailed explanation of why it believes no hearing was required. *Burlington Northern*, 143 F. Supp. 2d at 45-55. We do not consider whether this was error, because BMWE does not raise the issue as a ground for reversal. "We liberally construe briefs in determining issues presented for review; however, issues not raised at all are waived." *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 794 (5th Cir. 1994).

2

therefore can be enforced by injunction. *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 578-79 (1971).

BMWE contends that the legislative history of the RLA mandates a narrower construction of the RLA than the text alone would dictate. Even if the BMWE's view of the legislative history is sound, this argument is unavailing, because "[l]egislative history is relegated to a secondary source behind the language of the statute in determining congressional intent; even in its secondary role legislative history must be used cautiously." *Aviall Serv., Inc. v. Cooper Indus., Inc.*, 263 F.3d 134, 140-41 (5th Cir.) (internal citations omitted), *vacated for rehearing en banc*, 278 F.3d 416 (5th Cir. 2001).[2]

BMWE's deliberate policy of repeatedly calling surprise strikes violates the statutory requirement that railroads and unions "exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce." 45 U.S.C. § 152 First. A surprise strike makes it difficult or impossible to resolve the underlying dispute between labor and management without "interruption to commerce." *Id.* Because management is unaware that a strike is impending, it cannot take steps that might prevent it. In cases where the contemplated surprise strike is illegal under the RLA, the carrier cannot obtain an injunction against it until after the strike has begun and an "interruption to commerce" has already occurred.

In addition to violating § 152 First, many of BMWE's surprise strikes were held to be in violation of the requirement that unions can resort to strikes in a dispute over "minor" issues only if they first have exhausted the RLA's compulsory dispute resolution mechanisms. *Burlington Northern*, 143 F. Supp. 2d at 680-85 (describing seven cases in which BMWE was enjoined from striking the appellees because the dispute at issue was minor).[3] This circumstances strengthens the conclusion that BMWE was engaged in a pattern of illegal activity.

B.

Precedent from other circuits supports this conclusion. Judge Leventhal, writing for the District of Columbia Circuit, held that "the continuing duty of responsible bargaining under the [RLA] fairly embraces reasonable notice of a strike or lockout or other self help." *Del. & Hudson Ry. v. United Transp. Union*, 450 F.2d 603, 622 (D.C. Cir. 1971). BMWE's argument that *Delaware & Hudson* was not decided under § 152 First is irrelevant, because the reasoning of the court is based on a generalized RLA "duty of responsible bargaining" that applies to § 152 First as readily as to other provisions of the Act.[4] *Id.*

---

[2] *Cf. Garcia v. United States*, 469 U.S. 70, 75 (1984) (holding that "only the most extraordinary showing of contrary intentions would justify a limitation on the 'plain meaning' of the statutory language").

[3] *See Burlington N.R.R. v. BMWE*, 961 F.2d 86, 89 (5th Cir. 1992) (describing RLA dispute resolution procedures for "minor" disputes and holding that resort to them before striking is mandatory).

[4] It is also incorrect to claim, as BMWE does, that *Delaware & Hudson*'s language requiring notice is mere *dictum*. The language occurs in the same part of the opinion as do the instructions to the district court, which had "continuing jurisdiction" over the dispute "for such further proceedings as may become appropriate, not
(continued...)

The Eleventh Circuit recently has held that "[w]hen the public interest, commerce, and a clear statutory provision are implicated, we will not shy away from holding the parties to their duties under the RLA so as to avoid 'any interruption to commerce.'" *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1308 (11th Cir.) (quoting § 152 First), *cert. denied*, 532 U.S. 1019 (2001). That court held that § 152 First's requirement that the parties "exert every reasonable effort to make and maintain" agreements qualified as a "clear statutory provision" that could be enforced by injunction whenever there is a threat of "any interruption to commerce." *Id.* The same reasoning applies to the section's

---

[4](...continued)
inconsistent with the opinion of this Court." *Delaware & Hudson*, 450 F.2d at 623.

The District of Columbia Circuit evidently expected that, although it had overturned an earlier injunction, an anti-strike injunction, possibly including a notice provision, might become necessary. Indeed, the language asserting a requirement of notice immediately follows the court's condemnation of an earlier union effort to "call a strike . . . without direct notice to the railroads." *Id.* at 622.

The circuit court likely feared that such action might be repeated. It noted that the union's earlier strike activity was "lawful" only because of "an assumption of good faith as to its stated purpose of the strike" and warned that "[t]he District Court has continuing jurisdiction to reappraise the union's good faith in the light of either substantial evidence not previously available or developments as to tactics and methods *following notice to the carriers of the strike call*." *Id.* at 623 (emphasis added). The latter passage suggests that the circuit court may have expected that the district court would not allow future strikes without prior "notice to the carriers of the strike call." *Id.*

mandate that labor and management "exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce," which occurs in the same sentence of § 152 First as does the provision enforced by the Eleventh Circuit.

Because we are persuaded by the plain text of the statute, by the reasoning of the District of Columbia and Eleventh Circuits, and by the desirability of avoiding a circuit split, we easily conclude that the BMWE did indeed violate its statutory duties under § 152 First. We need not, however, go as far as the District of Columbia Circuit did in concluding that *any* "deliberate timing of a strike without prior warning" violates the statute. *Delaware & Hudson*, 450 F.2d at 622. For purposes of the present case, we decide only that the statute forbids an ongoing, repeated practice of surprise strikes that are doomed later to be held illegal and enjoined. *See Burlington Northern*, 143 F. Supp. 2d at 679-85 (describing extensive history of surprise strikes by the BMWE against appellees that later were enjoined). We need not and do not address the question whether the RLA forbids *all* surprise strikes. Nor do we need to reach the Eleventh Circuit's holding that anti-strike injunctions are appropriate any time a union's violation of a "clear statutory provision" threatens "interruption to commerce." *Delta*, 238 F.3d at 1308.

### C.

BMWE argues that recognizing an enjoinable statutory duty to avoid surprise strikes under § 152 First also would allow courts to enjoin a variety of other union and management practices that arguably evidence a failure to "exert every reasonable effort . . . to settle all disputes." 45 U.S.C. § 152 First. For example, BMWE claims that a broad

interpretation of § 152 First would allow courts to enjoin carriers' refusals to settle a minor dispute or to maintain the status quo pending arbitration.

These and other similar examples are readily distinguishable from surprise strikes, because § 152 First applies only to actions that cause "interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First. The actions posited by BMWE, while they may make dispute resolution more difficult, do not, in and of themselves, interrupt commerce, while surprise strikes undeniably do. And strike prevention, not dispute resolution *per se*, was "the major purpose of Congress in passing the Railway Labor Act." *Texas & New Orleans*, 281 U.S. at 565.

### III.
### A.

Having concluded that the BMWE's actions violated the RLA, we turn to the question whether the injunction is barred by the NLGA. That statute "expresses a basic policy against the injunction of the activities of labor unions." *Int'l Bhd. of Machinists v. Street*, 367 U.S. 740, 772 (1961) (citing 29 U.S.C. § 101). Nonetheless, "the [NLGA] does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Id.*

When considering requests for injunctive relief under the RLA, "courts should hesitate to fix upon the injunctive remedy unless that remedy alone can effectively guard the plaintiff's right." *Chicago & North Western*, 402 U.S. at 582. The Supreme Court, however, also has said that the NLGA does not bar injunctive relief under § 152 First,

reasoning that "[w]e find it quite impossible to say that no set of circumstances could arise where a strike injunction is the only practical, effective means of enforcing the command of § [152] First." *Id.*

BMWE's strategy of calling numerous surprise strikes is precisely the sort of violation of the RLA for which an injunction "is the only practical, effective" remedy. *Id.* BMWE repeatedly has demonstrated its willingness to call surprise strikes that violate its obligations under the RLA. Normally, such illegal conduct could be deterred through after-the-fact actions for damages. This court, though, specifically has held that there is no damage remedy for violations of § 152 First. *See Burlington N. R.R. v. BMWE*, 961 F.2d 86, 89 (5th Cir. 1992); *Nashville R.R. v. Brown*, 252 F.2d 149, 155 (5th Cir. 1958).

Preemptive injunctive relief is the only available remedy for illegal surprise strikes by the BMWE. An injunction issued only after an illegal strike has begun cannot undo the damage caused to the carriers from the beginning of the strike to the issuance of the injunction.

More importantly, an after-the-fact injunction cannot prevent the "interruption of commerce" that will have occurred during this period; stopping such disruption is, as we have seen, the main purpose of the RLA. 45 U.S.C. § 152 First. Finally, after-the-fact injunctions would not give the BMWE any incentive to refrain from illegal strikes in the first place, because it still would receive the benefit of any damage to the carriers inflicted before the injunction went into effect.

To be sure, the district court could have chosen to enjoin only unambiguously illegal

surprise strikes—those that are over "minor" issues. But if the carrier learns of the strike only after the fact, it cannot litigate the "major-minor" issue until after the strike has begun. At that point, if the carriers prevail in court, they still will not receive compensation for the disruption of operations inflicted by the strike while it lasted.

The case might well be different if the BMWE had not utilized illegal surprise strikes on so many occasions. If such tactics were limited to rare, isolated instances, there might be no need for an injunction to address the problem, which would be unlikely to recur. In the present case, however, a long history of systematic abuse left the district court with no choice but to resort to an injunctive remedy. There was no other way to prevent the extensive disruption of commerce and damage to the carriers caused by an ongoing policy of surprise strikes.

### B.

BMWE argues, nonetheless, that, under the NLGA, the injunction is improper in light of *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236 (5th Cir. 1975). There, we did indeed condemn "overbroad use" of anti-strike injunctions; we required that "[e]very order granting an [anti-strike] injunction . . . shall be specific in its terms, shall describe in reasonable detail, and not by reference to the complaint or other document the act or acts sought to be restrained." *Id.* at 1245-46.

*United States Steel* is readily distinguishable from the present case. The injunction against BMWE is much less sweeping than that in *United States Steel*, which "was nothing less than an injunction against striking for the life of the contract[,] an order to work every day."

*United States Steel*, 519 F.2d at 1245. Here, the court merely required ten days' notice of a strike and did not come close to enjoining the right to strike itself.

Second, *United States Steel* is distinguishable because it was decided under Supreme Court precedent that forbids enjoining any strike under the Taft-Hartley Act absent "a finding in each case that the strike was over an arbitrable issue." *Id.* There is no such requirement under the RLA.

*United States Steel*'s requirement that "[e]very order granting an [anti-strike] injunction . . . shall be specific in its terms [and] shall describe in reasonable detail . . . act or acts sought to be restrained," *id.* at 1245-46, presumably is still applicable to the present case. The injunction does not run afoul of it, however. The injunction undeniably is "specific in its terms," requiring that the union provide ten days' notice of all strikes against the plaintiff carriers. *Id.* Unlike the situation in *United States Steel*, in which there was "no specific act . . . complained of in the motion for . . . injunction," here the carriers complain of a longstanding BMWE strategy of calling surprise strikes that violate the RLA. *Id.* at 1246.

### IV.

In summary, BMWE has persisted in undermining the purposes of the RLA by repeatedly engaging in strikes that are plainly unlawful. The district court has carefully tailored a remedy designed to take care of this specific factual situation. Following the lead of two sister circuits that have approved the availability of injunctions to thwart similar violations of law, we AFFIRM the judgment of permanent injunction.

6

DUPLANTIER, District Judge, dissenting:

The Railway Labor Act, 45 U.S.C. §151, et seq., (RLA) regulates in great detail the relationship between railroads and the unions which represent railway employees. Section 152 First of the RLA provides that carriers and their employees have a duty "to exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." Because I conclude that a court has no authority to add to that duty a requirement that a railway union provide advance notice before engaging in a strike, work stoppage, or other job action against a carrier, I respectfully dissent.

Appellant Brotherhood of Maintenance of Way Employees (BMWE) is a labor union which represents those employees of numerous railroads who are responsible for maintaining, repairing and rehabilitating railroad tracks throughout the United States. Since 1993 BMWE has engaged in twelve strikes or planned strikes, each one against at least one of the six railroads who are plaintiffs in this suit. In each instance, the union gave no advance notice to the railroad of its intent to commence a strike. The railroad in question ultimately obtained injunctive relief against each of the strikes, on the ground that the dispute which gave rise to the strike was a "minor dispute," as to which a strike is unlawful. *See Consolidated Rail Corp. v. Railway Labor Executives Assn.*, 491 U.S. 299, 304 (1989). In each injunction suit brought by the railroad, the union contended that the strike or planned strike was lawful, primarily because the disagreement between the parties involved a major dispute. Where a major dispute is involved, a party may resort to a strike after exhausting the bargaining and mediation process mandated by §§5 and 6 of the RLA.

*Id.* at 303.

None of the statutes regulating the relationship between railroads and the unions representing railroad employees requires advance notice of a union's intention to strike, and during the many years since the enactment of those statutes, no railroad has sought a statutory amendment to require such notice.[5]

This suit, which was not filed in response to a strike or in anticipation of a threatened strike, represents in effect an attempt by the railroads to amend the RLA through judicial interpretation rather than legislative amendment, a tactic one carrier has previously tried unsuccessfully.[6]

The six railroad appellees initiated this suit, seeking a declaratory judgment to the effect that BMWE has violated §152 First, by authorizing, encouraging, permitting, calling, or engaging in self-help, including strikes, without notice, over disputes involving what BMWE characterizes as unilateral changes in agreements, and by engaging in such conduct as a pattern, practice, or policy. The railroads also sought an injunction requiring BMWE in the future to give ten days advance notice of its intent to commence any job action against any of the plaintiff railroads, thereby giving the railroad the opportunity to obtain a restraining order in advance of

---

[5] At oral argument, counsel for the railroads advised that in the 76 years since the RLA's enactment no railroad had ever sought such an amendment from Congress.

[6] In 1998, Burlington Northern and Santa Fe Railway Company, an appellee herein, filed suit in the Northern District of Texas seeking, among other things, a mandatory injunction requiring the union to give 3 days advance notice of future strikes. *Burlington N. & Santa Fe Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 93 F.Supp. 2d 751 (N.D. Tex.2000) The district judge denied the railroad that relief but suggested that on a different record such an injunction regulating future conduct by the union might be justified. *Id.* at 760. The district court's denial of the injunction was not appealed.

the threatened union action. The railroads urged that the advance notice requirement was warranted to prevent significant economic losses resulting from an illegal strike, losses for which the railroads cannot recover damages from the unions. *See Louisville & Nashville Railroad Company v. Brown,* 252 F.2d 149, 155 (5th Cir. 1958).

The district court granted the railroads' motion for summary judgment, based in large part upon the decisions in eighteen prior suits[7] between the railroads and BMWE over an eight year period in nine different federal district courts. Each of these suits resulted ultimately in a grant of a railroad's petition for an injunction halting an ongoing strike or prohibiting what was perceived as a threatened strike. In granting the injunction on appeal before us, the district court also relied upon statements made by union executives in depositions and press releases. Upon this summary judgment record the railroads convinced the district court that BMWE had demonstrated a pattern, practice, and policy of engaging in illegal self-help activities. Based upon that finding, the district judge in effect amended the RLA (as applicable to parties to this litigation), to add a requirement that the union must give the railroad ten days advance notice before initiating any job action, including a strike. The injunction contained no temporal or geographic limitation, nor was it restricted only to union actions taken in response to specific circumstances.

While advance notice of a union's intent to strike or to utilize any self-help action may be a laudable objective in any comprehensive statute regulating the

---

[7] In his Memorandum Opinion and Order the district judge refers to eighteen suits in which a temporary restraining order or an injunction was issued against the union. *Burlington N. & Santa Fe Ry. v. BMWE*, 143 F.Supp. 2d 672, 679-685 (N.D. Tex. 2001). However, only nine involved actual strikes by the union. The other nine involved either what the railroads perceived as a threatened strike, including what the district court characterized as situations where "BMWE refused to provide assurance that it would not strike," or a counterclaim filed by the carrier seeking an injunction in a suit initiated by the union.

relationship between railway unions and railroad carriers, such as the RLA, the statute cannot be construed to impose such an obligation upon a union.

I agree with the majority that the district court's opinion provides "a persuasive explanation of its reasons for entering the injunction," but I disagree that it supports the judgment granting the injunction. A requirement of advance notice of intent to strike may well be sound public policy; however, the imposition of such a requirement is for Congress, not the court.

The procedural history of the RLA is significant and somewhat unusual. After extensive negotiations, the railway unions and the railroads presented a proposed statute to Congress, which enacted into law the precise agreement submitted by the unions and the carriers. Thus the RLA strikes a delicate balance between the competing interests of the unions and the carriers. The advance notice requirement imposed by the district court forever shifts the balance embodied in the RLA, as between the plaintiff railroads and the BMWE.

The importance of maintaining the delicate balance embodied in the RLA has been consistently recognized. In both *Norfolk Southern Ry. Co. v. Brotherhood of Locomotive Engineers*, 217 F.3d 181, 190 (4th Cir. 2000) and *CSX Transportation, Inc. v. Marquar*, 980 F.2d 359, 380 (6th Cir. 1992), the court relied upon the desirability of maintaining this delicate balance between the railroads and the railway unions as the rationale for denying railroads the right to recover damages from unions which had breached their duty to arbitrate a minor dispute by engaging in an illegal strike. As noted above, the railroads contend they should be granted an injunction because they cannot recover damages for an unlawful strike. The very reason for denial of damages applies equally to an injunction: "[d]amages awards between railroads and unions . . . threaten the delicate balance intended by the RLA." *Id.* So too would the court-created advance notice requirement at issue here.

Had Congress wanted to impose a duty of advance notice on unions, it certainly knew how to do so. In my view, the district court usurped the legislative function of Congress by imposing a duty that may well be beneficial for the common good, but is not authorized by §152 First or any other statute.

In affirming the district court, the majority relies in part upon the desire to avoid a split between the circuits. I submit that denial of the injunction sought by the railroads would not create a circuit split. Neither case cited by the majority involved the situation presented here: an injunction for an unlimited period of time, involving future activity under unspecified circumstances, in a suit filed at a time when no adverse activity by the union is pending or then threatened. In *Delta Air Lines, Inc. v. Air Line Pilots Ass'n. Int'l*, 238 F.3d 1300, 1311 (11th Cir. 2001), the court limited the injunctive relief to directing the union "to take further steps to end the pilots' no-overtime campaign" then pending. In *Del. & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603 (D.C. Cir. 1971), the court of appeals reversed the district court's order enjoining the union then involved in a wage and rule dispute with various railroads from conducting a selective strike against fewer than all of the plaintiff railroads. The court concluded that the district judge granted the injunction based upon an erroneous legal premise. The court of appeals remanded the case, subject to the continuing jurisdiction of the court of appeals, noting that the obligation of a carrier and a union "to treat with each other through responsible conduct of the process of collective bargaining . . . is not consistent with such actions as a deliberate timing of a strike without prior warning, with the purpose of enhancing plant damage, or some other garrotte of jungle warfare." *Id.* at 622 (internal quotation and citation omitted,). I respectfully disagree with the majority's conclusion that the quoted statement is not dicta. Needless to say, the denial of an injunction in the instant case could not cause a split with another circuit which also denied an injunction. Moreover, *Del. & Hudson Ry. v. United Transp. Union* did not involve a request for an injunction such as the one at issue in this case. There, unlike here, there was a specific disagreement and a specific threatened act triggering a request for specific injunctive relief.

Moreover, assuming *arguendo* that §152 First authorizes a court to impose a duty of advance notice upon a union which has demonstrated in the past a pattern, practice or policy of illegally engaging in self-help, the summary judgment evidence before the district court does not support its conclusion that appellant has engaged in such illegal activities.

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.Pro. 56(c). A genuine issue of fact exists where the evidence is such that a reasonable party could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies that burden, then the non-movant must go beyond the pleadings and identify specific facts demonstrating that there is a genuine issue of material fact for trial. *Id.* at 324. Factual controversies are resolved in favor of the non-moving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The majority declines to consider whether it was error for the district court to make "factual findings without an evidentiary hearing . . . because BMWE does not raise the issue as a ground for reversal." What the union clearly does raise on appeal is that the summary judgment record does not support the district court's characterization of the union's prior activities as an unlawful "pattern, practice, and policy of authorizing, encouraging, permitting, calling, or engaging in strikes, work stoppages, picketing, or other self-help" against the railroads. BMWE's briefs clearly challenge the district court's findings of undisputed facts to support summary judgment. Indeed, the record excerpts submitted on appeal by BMWE include the affidavits of Steven V. Powers, the assistant to the president of the BMWE, in which he sets forth specific facts disputing various "undisputed material facts" relied upon by appellees in moving for summary judgment.

To conclude that BMWE's pattern of behavior warrants imposing a requirement that it provide advance notice of its intent to utilize self-help, it is not enough simply to look at the union's "won-loss" record in previous litigation. To reach such a conclusion it would be necessary to examine the background of each suit to determine whether the union undertook the challenged activity with a reasonable belief that the dispute giving rise to the challenged or threatened activity constituted a major dispute between the parties, which would have justified the strike which was the subject of the suit. That inquiry is essential because, as the Supreme Court has

recognized, "distinguishing between major disputes and minor disputes" can be a "difficult task." *Consolidated Rail Corp. v. Railway Labor Executive Assn.*, 491 U.S. at 310. The validity of that observation is borne out by the following analysis of the prior suits between appellant and appellees.

In two of the nine suits involving actual strikes, the union prevailed at the district court level, only to lose on appeal.[8] Additionally, in *Atchison, Topeka & Santa Re Ry. Co, v. Brotherhood of Maintenance of Way Employees,* No. 94C2765 (N.D. Ill. May 4, 1994), in granting the railroad a temporary restraining order after concluding that a minor dispute was involved, the district court acknowledged that "BMWE raise[d] a substantial argument" that the dispute at issue was properly characterized as a major dispute. The railroads do not challenge the union's contention that in three additional situations the railroads voluntarily ceased the action giving rise to the strike.[9]

The district court also relied in part upon the union's stated policy that it "will do what it has to do" to protect its members. That policy is simply a statement that the union will do its duty toward its members; it does not support a conclusion that the union planned to engage in unlawful activity in the future.

The district court developed an insufficient record

concerning whether the union acted in good faith in undertaking the job actions in the prior suits between the union and a carrier. The summary judgment record developed before the district court does not support its conclusion that the union has demonstrated a pattern, practice, and policy of illegally engaging in self-help activities.

The foregoing analysis of the district court's decision to issue an injunction on summary judgment is not intended to weaken the conclusion that the injunction sought by appellees should not issue in any event.

I would reverse the summary judgment entered by the district court and remand to the district court for further proceedings not inconsistent herewith.

---

[8] *Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.,* No. 96-1515, 96-1524, (C.D. Ill. December 17, 1996, *reversed on appeal* 138 F.3d 635 (7th Cir. 1998)*; Brotherhood of Maintenance of Way Employees v. Union Pacific Railroad Co.*, No. 00-2-396 (D. Colo. 2000), *reversed* No. 00-1105 (10th Cir. December 21, 2000).

[9] *CSX Transp., Inc. v. Brotherhood of Maintenance of Way Employees,* No. 95-813 (M.D. Fla. August 28, 1995); *Norfolk Southern Ry. Co. v. Brotherhood of Maintenance of Way Employees,* (W.D. Va.. November 8, 1996); *Consolidated Rail Corp. v. Brotherhood of Maintenance of Way Employees,* No. 98-CV- 4277 (E.D. Pa. August 14, 1998).