KLEINFELD, Senior Circuit Judge,
joined by O’SCANNLAIN, SILVERMAN and TALLMAN, Circuit Judges dissenting:
We should affirm. The district court and the panel opinion got it right. •
The Railway Labor Act protects the public from the consequences of some labor strife with an especially grave impact on those other than the companies and employees involved. That is why it mandates extensive negotiation, mediation, and arbitration procedures in any major transportation dispute[1] before allowing lockouts or strikes. The anti-injunction provisions of the later Norris-LaGuardia Act cannot be read into the Railway Labor Act before that settlement process is undertaken, without gutting the Railway Labor Act. By expanding the reach of the Norris-La-Guardia Act this way, the majority creates a circuit split.[2] Shutting down the Se *1086 attle-Tacoma International Airport (“Sea-Tac”) amounts to the blockade of a major American port which imposes harms on nonparticipants in the labor dispute that vastly outweigh the interests of the company and its employees. That is why injunctions are available to enforce the Railway Labor Act notwithstanding the Norris-La-Guardia Act.
The injunction, together with the Railway Labor Act conciliation process, provides the statutory means Congress prescribed for making labor and management negotiate, whether they choose to or not. The Railway Labor Act and the traditional .four-part test for injunctions[3] together ensure, as they did in the district court, that airports be kept open while negotiations go on, regardless of whether one side or both may be unreasonable. The final Winter[4] consideration, the public interest, is in effect written into the Railway Labor Act.
I. Facts
The company in this case, Aircraft Service International Group, Inc. (“Aircraft Service”), refuels about 75% of the airplanes at Sea-Tac. The company suspended one of its aircraft fuelers, Alex Popescu. The company says it suspended Mr. Popescu because employees were concerned about their safety on account of his “blowups” at work, episodes that he attributed to a medical condition. The general manager reported receiving complaints from employees that Popescu “went into a fit of rage” that appeared “borderline psychotic” and “was out of control and repeatedly had screamed obscenities at a supervisor.” When, after suspension, the company tried to discuss Popescu’s situation with him, he again yelled obscenities, “threw his chair across the room, and slammed the door as he left the room.”
The employees have not voted to be represented by any union, so no labor union is involved. So far as the record shows, no one is authorized to speak for Popescu but Popescu himself, and the company’s attempt to speak with him failed because he walked out and slammed the door. One of the adverse parties in this case is “Working Washington,” which is not a union, but a group that describes itself as “a coalition of individuals, neighborhood associations, immigrant groups, labor unions, civil rights organizations, and people of faith.” Working Washington’s “Campaign Director” says that although Working Washington “is not seeking to become the bargaining representative” of the employees and has not sought recognition, it advocates for better treatment of workers at the airport.
Working Washington’s campaign director says that the employees are compelled to work with unsafe and inadequate equipment and that the company suspended Popescu because he had become a leader in public advocacy for safer and better equipment for the fuelers. According to the campaign director, the obscenity incident was a mutual exchange of yelled obscenities when Popescu complained of a broken drive shaft and the supervisor accused him of sabotaging it. The campaign director alleges that Working Washington distributed and collected strike ballots and held a press conference to announce that the fuelers had authorized a strike against Aircraft Service.
Working Washington’s campaign director further states in his affidavit that the fuelers, at a gathering organized by Working Washington, “called the company’s Human Resources Department in Denver to request an immediate end to *1087 [Popescu’s] suspension.” He states, “I believe that similar calls continued throughout the evening and into the next morning.” The fuelers did not get a response. The record does not contain any non-hearsay evidence about these calls, or for that matter, evidence that there were even any company personnel in the Denver office “throughout the evening and into the next morning” to receive such calls. This alleged barrage of phone calls appears to be the basis for'the majority’s view that the employees sought to negotiate and that it was the company that stonewalled them.
Neither Working Washington nor the fuelers asked the National Mediation Board to intervene at that time. Neither did the company. A few weeks after the strike announcement, and after the temporary restraining order and preliminary injunction, six of the employees, including Popescu, wrote to the National Mediation Board, in their capacity as unrepresented individual employees, asking whether it provided any sort of dispute resolution services. The Board replied that it provided mediation services to carriers and to designated bargaining representatives of their employees, but not to individual employees or groups, so services were not available to the six employees because they had not been designated as the bargaining representatives for all the employees.
We do not know, there being no findings of fact on the point, whether Popescu’s supporters really did try to meet with or call the company representatives, or whether the company acted unreasonably in not meeting with whoever claimed to represent its employees. The majority says the strike cannot be enjoined because the company made no “reasonable effort” to settle the dispute. That purported fact is not established. But it does not matter. The Railway Labor Act generally requires both parties to negotiate, mediate, and arbitrate, before either of them can shut down the airport. The point of the statute is to protect the public against the exter-nalities of the labor dispute, not merely to protect management or labor against hard-heads on the other side of the table.
II. The Statutes
The Railway Labor Act.is among the first statutes protecting labor and encouraging union organization. Its first two objectives, written into the statutory language, are “to avoid any interruption of commerce” and “to forbid any limitation upon freedom of association among employees or any denial ... of the right of employees to join a labor organization.”[5] The Act, though encouraging unionization, applies to unrepresented employees as well, such as the fuelers in this case. The plain text of the Railway Labor Act defines “employee” as “every person in the service of a carrier.”[6] Both carriers and “employees,” whether unionized or not, must try to settle their disputes “to avoid any interruption to commerce”[7]:
It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.[8]
*1088 The Act generally requires the parties to confer, mediate, and arbitrate their disputes:
The [Railway Labor Act] provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. The parties must confer, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. If arbitration is rejected and the dispute threatens ‘substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,’ who may create an emergency board to investigate and report on the dispute. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo.[9]
The fuelers, or at least those persuaded by Working Washington, proposed to strike without going through these procedures, and they claim that they can do this because they are not unionized and because the company has not made a reasonable effort to settle the dispute. Judge N.R. Smith in the panel opinion noted:
Here, the Employees are unwilling to even ‘go through the motions’ under the [Railway Labor Act]; rather, they wish not to bargain but to strike. In so doing, they present the very situation for which Congress enacted the [Railway Labor Act]: carrier employees collectively threatening a strike capable of single-handedly interrupting interstate commerce by shutting down an airport.[10]
These statutory duties are clear enough. But what happens if one or both parties do not do what the Railway Labor Act says they should do?
The subsequently enacted Norris-La-Guardia.Act, promulgated in 1932, might have been read to categorically prohibit injunctions to enforce compliance with Railway Labor Act settlement procedures.[11] After all, the Norris-LaGuardia Act generally strips federal courts of jurisdiction to issue injunctions in labor disputes.[12] This could have been read as a limit on remedies available under the Railway Labor Act.
But the Supreme Court did not read it that way. Brotherhood of Railroad Trainmen v. Chicago River Indiana Railroad Co.[13] held that the Railway Labor Act procedures are compulsory[14] and the district courts do indeed have jurisdiction to enjoin noncompliance.[15] The Court explained *1089 that amendments strengthening the Railway Labor Act in 1934, subsequent to the Norris-LaGuardia Act, repaired the “major weakness” or “lack of any compulsion” in the 1926 version of the Railway Labor Act.[16]
The Court further held that “the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act,” [17] because the Norris-LaGuardia Act protects workers generally, but the Railway Labor Act “channel[s]” the economic forces of labor and management “into special processes intended to compromise them.”[18] The Court explained that injunctions prohibited by the Norris-LaGuardia Act “strip[ ] labor of its primary weapon without substituting any reasonable alternative.” [19] The Railway Labor Act, by contrast, provides labor with a “reasonable alternative,” the mediation and settlement process set out in the Act. It applies to “all” disputes regarding “rates of pay, rules, or working conditions”[20] and to “every person in the service of the carrier.”[21] This reasonable alternative eliminates the need for the Norris-LaGuardia Act’s jurisdiction-stripping provisions to even the playing field.[22] The employees need not be a member of a union to invoke the Railway Labor Act because it facilitates selection of a representative for mediation regardless, so they need not have a dispute under a collective bargaining agreement to invoke it. The Railway Labor Act establishes that employees as well as carriers must make every reasonable effort to settle disputes “whether arising out of such agreements or otherwise.”[23] The “or otherwise” language means that a collective bargaining agreement is not a prerequisite to the Act’s application.
Any question about the breadth of Chicago River was answered by the Court in Chicago & North Western Railway Co. v. United Transportation Union.[24] There, the Court held that “strike injunctions may issue when such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements.”[25] Such a holding gives effect to the broad congressional policy “[t]o avoid any interruption to commerce” by premature labor strikes[26] Indeed, the Chicago & North Western Court was particularly aware of the dangers of such interruptions.[27] We now know, if we did not before this pair of cases, that the jurisdiction-stripping provisions of the Norris-LaGuardia Act do not apply to disputes, such as this one, where the parties have not first engaged in any of the procedures of the Railway Labor Act.
Chicago & North Western[28] and Chicago River[29] both rely heavily on legislative history in interpreting the Railway Labor Act. Such history merely confirms the meaning of the clear text of the statute. *1090 The Court held that statements during the Railway Labor Act hearings by “spokesmen of the two parties” should be given great weight in construing the Act.[30] These statements confirm that petitioners cannot evade the Act’s settlement procedures simply because they are not unionized.
Senator Watson declared that both attorneys for labor and management agreed on the scope of the law: “They all state to me that beyond any doubt in the world[,] all classes and groups and individuals are covered ... every individual employee who has a grievance, or any group of employees, or any organization of employees, or any person not a member of any organization of employees.”[31] During the House debates over the 1934 amendments, the topic resurfaced since it was “rumored ... that this Senate amendment require[s] the employees of every railroad ... to be unionized before they can get any benefit.” This supposition was again rejected, with Representative Crosser firmly stating that the amendment would “not require any such thing.”[32]
Even when an injunction is the only practical, effective means of enforcing duties under the Railway Labor Act, the Supreme Court has held, in some cases, that Section 8 of the Norris-LaGuardia Act[33] does indeed qualify issuance of an injunction with a codified clean hands requirement. The Court held in Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad Co.[34] that Section 8’s “unclean hands” provision prohibited the district court from enjoining a strike under the Railway Labor Act because the railroad had failed to make every reasonable effort to settle the dispute.
The difference between the situation in Toledo, Peoria and our case is that the railroad and the union in Toledo, Peoria had indeed gone through the Railway Labor Act process prior to the strike. In our case, the order of events is strike first, mediation maybe later, maybe never. In Toledo, Peoria, it was Railway Labor Act procedures first, strike later, when the railroad refused to complete the Railway Labor Act process by arbitrating. What made the unclean hands provision of Section 8 of the Norris-LaGuardia Act applicable was the railroad’s rejection of “the final and crucial step of arbitration.”[35]
We have similarly interpreted Section 8 to apply in situations where both parties have engaged in the Railway Labor Act procedures, but then one of them has abandoned the process in bad faith. In Switchmen’s Union of North America v. Southern Pacific Co., we upheld a carrier’s injunction notwithstanding Section 8 because the carrier had not “failed to perform its obligations under ... the Railway Labor Act, or ... lacked good faith in attempting to settle this dispute.”[36] In Trans International Airlines, Inc. v. International Brotherhood of Teamsters, we rejected both the union and the carrier’s *1091 clean hands arguments in a dispute where the carrier and union had negotiated and mediated, but the union had refused arbitration.[37] In Order of Railway Conductors & Brakemen v. Spokane, Portland & Seattle Railway Co., we prohibited the carrier’s injunction when the union sought mediation, but the carrier declined.[38] In Butte, Anaconda & Pacific Railway Co. v. Brotherhood of Locomotive Firemen & Enginemen, we prohibited the carrier’s injunction under Section 8 when the carrier abandoned mediation.[39] To get the benefit of Toledo, Peoria and to be able to bar the injunction, employees must participate in the Railway Labor Act dispute resolution process, as the unions and carriers did in these earlier cases.
The majority argues that our emphasis on the conduct of the fuelers is a “red herring” because Section 8 only applies to the “complainant,” and that “no authority” reheves a carrier from the mandates of Section 8. That reading eviscerates the statutory command that “[i]t shall be the duty of ... employees,” not just carriers, “to exert every reasonable effort ... to settle all disputes ... in order to avoid any interruption to commerce....”[40] The majority cites no case in this or any other circuit where Section 8 of the Norris-La-Guardia Act barred a Railway Labor Act injunction, where the employees went on strike without first engaging in any of the Railway Labor Act procedures. There is no such case because such an application would frustrate the purposes of the Railway Labor Act. The majority’s “modest” rule allows employees of a carrier to strike without fear of injunction as long as they are not unionized and some rump group without representational authority makes some late night phone calls demanding talks with the carrier.
Like Chicago River and Chicago & North Western, Toledo, Peoria relies on legislative history in construing Section 8 narrowly in the Railway Labor Act context. Representative LaGuardia assured Congress that the Railway Labor Act “provides every detail for the settlement of disputes” and that “[t]he workers could not and would not think of going on strike before all the remedies provided in the law have been exhausted.”[41] Recognizing this, the Court in Toledo, Peoria establishes that a carrier must have had the opportunity to engage in the Railway Labor Act procedures before Section 8 would apply:
[I]n response to an inquiry whether or not Section 8’s requirements would apply where it might be impossible to move for settlement by negotiation, mediation or arbitration, [Representative LaGuardia] stated: “The answer to that is simple. In seeking a restraining order a party believed to be aggrieved comes into court and under a certain state of facts, which are enumerated in the bill itself, asks for a restraining order. If time has not permitted him or the corporation to avail itself of the existing governmental machinery for the settlement of a labor dispute, he recites that as one of his facts, which is a full compliance, of course, with the provisions of section 8, which makes it a condition precedent that every remedy must be exhausted to settle the strike before the injunction will issue.”[42]
*1092 Contemporary methods of statutory construction might not rely as heavily on legislative history as the Supreme Court did in Chicago River, Chicago & North Western, and Toledo, Peoria. But the Court did so rely, and in Chicago & North Western held that because the Railway Labor Act was a “legislative product devised by the parties themselves, which Congress enacted,”[43] it should be construed with “particular attention ... to the legislative history of the Act.”[44] We are thus required by Chicago & North Western to use legislative history to construe the Railway Labor Act. Doing so, we should join the Seventh Circuit’s United Air Lines decision,[45] construing the relationship of the Norris-LaGuardia clean hands provision to the Railway Labor Act as Representative LaGuardia said it should be construed. United Air Lines holds that Section 8 of the Norris-LaGuardia Act does not relieve employees of their duties under the Railway Labor Act to settle disputes and avoid interruptions to commerce. It further holds that a carrier may be entitled to an injunction even' where negotiation has not yet taken place. United Air Lines explains that to “requir[e] a carrier to seek a negotiated solution before moving to enjoin an illegal work action would enable unions to use such actions to extort concessions from the carrier during the negotiation process. Such'a result would render the union’s duty under 45 U.S.C. § 152, First a nullity... .”[46] Today, the majority does indeed render the employees’ duty to follow the Railway Labor Act procedures a nullity, by depriving the courts of the ability to enforce the Railway Labor Act.
III. The Public Interest
The reason injunctions are so important to the Railway Labor Act conciliation system is that strikes in the transportation industry have so great an impact upon uninvolved parties:
Railway (and airline) labor disputes typically present problems of national magnitude. A strike in one State often paralyzes transportation in an entire section of the United States, and transportation labor disputes frequently result in simultaneous work stoppages in many States.[47]
A little bit of concrete history shows this impact. In 1934, Alaska and many other West Coast states suffered the effects of a massive longshoremen’s strike. On May 9, 1934, West Coast longshoremen not covered by the Railway Labor Act[48] called a strike that effectively closed the port of Seattle and every other major port on the West Coast[49] In less than a week, Alaska lost mail service.[50] After two weeks, the *1093 Anchorage Chamber of Commerce estimated that the city had only 10 more days’ supply of eggs, butter, and flour, and that the whole territory would be without general supplies in thirty to sixty days.[51] Members of the general public bore the immense costs of the strike. Sixteen mills closed in Washington and Oregon and an estimated 10,000 people lost their jobs because the mills could not “get raw materials or send products by water.”[52] By the end of the 86-day strike,[53] eight lives had been lost.[54] The financial stake disputed by the union and carriers was doubtless a small fraction of the $200,000,000 in total lost revenue at ports from Bellingham to San Diego, not including additional losses to individuals and local businesses.[55]
Three of our sister circuits[56] have upheld injunctions under the Railway Labor Act’s Section 152, First, notwithstanding the Norris-LaGuardia Act’s jurisdiction-stripping provisions, because of the devastating impacts on the public associated with transportation strikes. Though these decisions evidently did not find it necessary to explicitly discuss Section 8 of the Norris-LaGuardia Act, they illustrate the proposition that the employees of a carrier have a separate enforceable duty under the Railway Labor Act to resolve disputes to avoid interruption of commerce, and that they should not be allowed to strike if they disregard this statutory duty.
The Eleventh Circuit held in Delta Air Lines v. Air Line Pilots Association that “when a specific provision of the [Railway Labor Act] is implicated, and there is no other effective way to enforce [it], the [Norris-LaGuardia Act] does not prohibit a federal court from issuing an appropriate injunction.”[57] The Eleventh Circuit reasoned that “[w]hen the public interest, commerce and a clear statutory provision are implicated, we will not shy away from holding the parties to their duties under the [Railway Labor Act] so as to avoid ‘any interruption to commerce.’ ”[58]
In Delta Air Lines, Delta pilots engaged in a concerted effort to decline taking “open time” flights.[59] As a result, Delta had to cancel many flights and the “traveling public” suffered immeasurable losses of time and money from delays and cancellations.[60] The Eleventh Circuit rejected the argument that the union had no duty to try to stop the pilots because the union had not sanctioned their actions. To the contrary, the Eleventh Circuit held that the union did have such a duty,[61] and if it could not prevent the strike, the district court had jurisdiction to enjoin the individual pilots’ concerted action.[62]
*1094 In National Railroad Passenger Corp. v. Transport Workers Union of America, the District of Columbia Circuit upheld a strike injunction,[63] despite the Norris-La-Guardia Act,[64] even though the “dispute [was] not amenable to resolution via the procedures of the [Railway Labor Act].”[65] In that case, when federal Amtrak subsidies fell below expected levels, five unions representing Amtrak employees called a strike.[66] The district court had held that the Railway Labor Act did not bar the strike “because the Unions’ dispute with Congress and with the administration over Amtrak funding cannot be resolved by negotiation, mediation or arbitration with Amtrak.”[67] The D.C. Circuit disagreed: “[T]he possibility that a politically tinged dispute cannot be ‘resolved’ by negotiation does not warrant a wholesale exception to the mandates of the [Railway Labor Act].”[68] The D.C. Circuit enjoined the strike because it had the “same adverse effect on interstate commerce as a strike motivated by more conventional labor concerns.” [69]
The Fifth Circuit similarly held in Burlington Northern v. Brotherhood of Maintenance of Way Employees that the Railway Labor Act’s requirement to ‘“exert every reasonable effort to make and maintain’” agreements could be enforced by injunction whenever there is a threat of “ ‘any interruption to commerce.’ ”[70] The Fifth Circuit was persuaded “by the plain text of the statute, by the reasoning of the District of Columbia and Eleventh Circuits, and by the desirability of avoiding a circuit split:”[71]
Therefore, notwithstanding the anti-injunction provisions of the Norris-LaGuar-dia Act it is clear that: (1) when the public interest, interruption of commerce, and a clear statutory provision of the Railway Labor Act are implicated, federal courts can enjoin concerted action by transportation employees acting without a union;[72] and (2) negotiation prior to an injunction is not a precondition to enjoining a strike since all transportation strikes can have catastrophic effects on interstate commerce.[73]
The Seventh Circuit and the District of Columbia Circuit have held that a public interest exception to Section 8 of the Norris-LaGuardia Act allows injunctions under the Railway Labor Act, even when Section 8’s requirements are not satisfied, because of the catastrophic effects of transportation strikes on interstate commerce. United Air Lines holds that “the imperatives of the [Railway Labor Act] may override § 8, and that a party’s lack of ‘clean hands’ under § 8 ‘may be overcome by a balancing of the interests, particularly where it is the public interest involved.’ ”[74] Brotherhood of Railroad *1095 Trainmen v. Akron & Barberton Belt Railroad also holds that “a lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved ... and that [a] restraining order should issue forthwith to avoid jeopardizing the Railway Labor Act.”[75] The majority omits consideration of the public interest in whether the primary air hub in the Northwest is shut down.
IV. Aircraft Service and Its Fuelers
The central argument of the majority is that an injunction ought not to have issued because Aircraft Service failed to “make any efforts” to settle the dispute. There is no district court finding of fact to that effect. All we have are three affidavits, two from Aircraft Service and one from Working Washington. The Aircraft Service representative at Sea-Tac says that he met with Popescu in person, joined by a human resources area manager by phone, but Popescu cursed at the area manager, threw his chair across the room, left, and slammed the door behind him. That cannot be a failure to “make any effort” by the employer. Working Washington’s campaign director says that Popescu supporters called the company’s human resources department throughout one evening and into the following morning and received no response. These events amount to the company’s unsuccessful attempt to settle with Popescu, and a few other employees’ attempts to settle Popes-cu’s issues with the company. We lack authority, as an appellate court, to make a finding of fact, as the majority appears to do, that the company made no effort to settle. They met with. Popescu, and he threw a chair and walked out.
If, as the majority appears to believe, the affidavits are treated as establishing facts, then there would be sufficient evidence that Aircraft Service made the reasonable efforts required by Section 8 of the Norris-LaGuardia Act. We held in Switchmen’s Union of North America v. Southern Pacific Co. that a carrier fulfilled its obligation under Section 8 when there was “no unfair surprise,” and “the company, in good-faith, [had] attempted to confer on the issue prior to the incident which led to the strike.”[76] No employee could claim to be “unfairly surprised” by a suspension for “cussing out” his boss. Aircraft Service’s refusal immediately to reinstate Po-pescu upon demand appears to have generated the vote to strike, but all three affidavits show that Aircraft Service attempted, in good faith, to confer with Po-pescu after his suspension and prior to the fuelers threatening to strike.
The real nub here, for Working Washington as well as Popescu and the six fuelers who wrote on his behalf, appears to be the company’s refusal to meet and attempt to settle with them, not Popescu. ' The company, after all, did meet with Po-pescu. Aircraft Service’s position was that it had no obligation to negotiate with Working Washington or those fuelers who made phone calls the night after Popescu was suspended. The National Mediation Board’s position was that it too had no mediation available for the six Popescu supporters. They were both right.
Working Washington, as its campaign director says in his affidavit, is not a union and has not been selected as a representative by Aircraft Service’s employees. Working Washington ■ has many constituents including “neighborhood associations, immigrant groups, labor unions, civil *1096 rights organizations, and people of faith.” Aircraft Service cannot assume that Working Washington represents its employees. Working Washington selected them, instead of the employees selecting Working Washington. Perhaps Working Washington would be looking out solely for the interests of Aircraft Service’s employees, or perhaps it would be serving its constituents’ interests and preferences and not Aircraft Service’s fuelers’ interests. Likewise, the fuelers who allegedly called the human resources department, and the six fuelers who wrote to the National Mediation Board, have not established a right to represent all the other fuelers.
The company’s affidavit says that employees wanted to get rid of Popescu because they feared he might damage their vehicles and his irrational rages created a safety threat to them. Perhaps more fuel-ers wanted to get rid of Popescu than wanted to keep him, because they feared for their own safety on account of Popes-cu’s erratic behavior. Perhaps Aircraft Service has been protecting the interests of most of its employees, while Working Washington is sacrificing their safety to some other agenda. We have no idea. Proper selection of a representative answers the question whether some group or entity represents the employees. An unsupported claim to speak on their behalf does not.
The Supreme Court held in Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co. that the Railway Labor Act “imposes upon the carrier ‘the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other.’ ”[77] The affirmative and the negative duty both arise out of the “essential foundation of the statutory scheme,” “[freedom of choice in the selection of representatives.”[78] The majority’s expansive reading of Section 8 of the Norris-LaGuardia Act would repeal this central feature of the Railway Labor Act and deprive Aircraft Service’s employees of what the Supreme Court characterized as a “liberty [that] should be safeguarded.”[79] That is the liberty of the employees to choose their own representative rather than having a representative forced upon them.
That right to pick the representative rather than having one imposed is why the Railway Labor Act creates a process for employees to select a mediation representative,[80] even if they are not unionized and do not choose to be represented by a union.[81] Any question of whether Popescu’s supporters, or Working Washington, ought to be negotiated with, or mediated or arbitrated with, is to be settled under the statute by the detailed procedures for designating representatives.[82] That explains why the National Mediation Board rejected the request for mediation by six individual fuelers. After all, suppose the company negotiated and mediated, and reached an agreement satisfying Working Washington and Popescu’s supporters, perhaps to reinstate Popescu with back pay. That might leave a majority of the fuelers at what they considered too much risk to their personal safety from Popescu. And Working Washington might be subordinating Aircraft Service’s employees interests to the interests and preferences of the “labor unions, civil rights organizations, *1097 and people of faith” that comprise it. A company is not obligated to, and may not, under Missouri-Kansas-Texas R.R. Co.,[83] negotiate and try to settle its employee disputes with an organization its workers have not chosen, that may be serving interests conflicting with the interests of most of its employees.
The statute requires that “not less than 50 percent of the employees in the craft or class” select a representative.[84] Perhaps Working Washington, or the employees who support Popescu, or both, should represent the fuelers and can be trusted to represent their interests, not others. They can. All they need to do is follow the Railway Labor Act’s straightforward process to get certified as their representative. Without that, they are in the position of a lawyer settling a case on behalf of a client who has not chosen to be represented by that lawyer, who perhaps represents someone else with a conflicting interest.
The record is uncontradicted that the company met with Popescu to discuss his suspension, but he slammed the door and walked out. Even were there some issue of fact about this, the injunction would still be within the district court’s discretion. A fair reading of the Railway Labor Act and the Supreme Court decisions interpreting that law’s relationship to the Norris-La-Guardia Act compels the conclusion that an injunction would still properly issue, compelling both sides to submit to the Railway Labor Act’s dispute resolution procedures before any strike could take place. That reading would be consistent with the Fifth, Seventh, Eleventh and District of Columbia Circuit’s interpretation of the Railway Labor Act’s Section 152, First. Delaying an injunction until findings can be made on which side is the more unreasonably hardheaded, and denying an injunction if the petitioner is the more unreasonable, defeats the Railway Labor Act’s first stated purpose, which is “to avoid any interruption to commerce.” That is why the district court quoted Section 152, First of the Railway Labor Act and explained that “Defendant’s interpre- " tation would wholly frustrate the [Railway Labor Act’s] overriding mandate, which is to impose a duty on carriers and their employees to ‘settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce....’” The district court was right.
V. Conclusion
The district court had jurisdiction and properly exercised it, by enjoining a strike unless and until the parties proceeded through the Railway Labor Act’s dispute resolution process. Keeping a major American airport open is too important to allow an evasion of that process by a rump group of employees or a purported spokesman that the employees have never authorized to speak for them. Congress passed the Railway Labor Act to protect against the harm such a strike would impose on uninvolved people all over North America. Today’s decision destroys that protection.

. Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 723-24, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) (defining "major disputes” as those where employees "seek to create rather than enforce contractual rights” and "minor disputes” as those relating to "the meaning or proper application” of a collective agreement).

. Compare United Air Lines, Inc. v. Int’l Ass’n of Machinist & Aerospace Workers, 243 F.3d 349, 365 (7th Cir.2001).

. Cf. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

. Id. at 26, 129 S.Ct. 365.

. 45 U.S.C. § 151a.

. Id. § 151, Fifth.

. Id. § 151a.

. Id. § 152, First.

. Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (citations omitted).

. Aircraft Serv. Int’l Inc. v. Int’l Bhd. of Teamsters, 742 F.3d 1110, 1120 (9th Cir.2014) (citation omitted).

. 29 U.S.C. § 101 ("No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.”).

. Id.

. 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

. See id. at 34, 77 S.Ct. 635.

. Id. at 42, 77 S.Ct. 635.

. Id. at 35, 77 S.Ct. 635.

. Id. at 42, 77 S.Ct. 635.

. Id. at 40-41, 77 S.Ct. 635.

. Id. at 41, 77 S.Ct. 635.

. 45 U.S.C. § 151a(4).

. Id. § 151 Fifth.

. See Chi. River and Indiana R.R. Co., 353 U.S at 41-42, 77 S.Ct. 635.

. 45 U.S.C. § 152 First (emphasis added).

. 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).

. Id. at 583, 91 S.Ct. 1731.

. 45 U.S.C. § 151a (emphasis added).

. See Chicago & N.W. Ry. Co., 402 U.S. at 581 n. 14, 91 S.Ct. 1731.

. See id. at 576-78, 580-82, 91 S.Ct. 1731.

. See 353 U.S. at 35-39, 77 S.Ct. 635.

. Chicago & N.W. Ry. Co., 402 U.S. at 576, 91 S.Ct. 1731.

. 1 The Railway Labor Act of 1926: A Legislative History 689-91 (Michael H. Campbell & Edward C. Brewer III eds., 1988) [hereinafter Legislative History ] (emphasis added).

. Legislative Histoty, supra note 31, at 1021.

. 29 U.S.C. § 108 ("No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.”)

. 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944).

. Id. at 64, 64 S.Ct. 413.

. 398 F.2d 443, 447 (1968).

. 650 F.2d 949, 953-54, 957 (9th Cir.1980) (Kennedy, J.) (upholding one injunction and reversing another on different grounds).

. 366 F.2d 99, 105 (9th Cir.1966).

. 268 F.2d 54, 57, 60 n. 10 (9th Cir. 1959).

. 45 U.S.C. § 152 First.

. See 75 Cong. Rec. 5504; Toledo, Peoria, 321 U.S. at 59, 64 S.Ct. 413.

. Toledo, Peoria, 321 U.S. at 59 n. 16, 64 S.Ct. 413 (quoting 74 Cong. Rec. 5508) (emphasis added).

. Chicago & N.W. Ry. Co., 402 U.S. at 589, 91 S.Ct. 1731.

. Id. at 588, 91 S.Ct. 1731.

. United Air Lines, Inc. v. Int'l Ass’n of Machinist & Aerospace Workers, 243 F.3d 349, 365 (7th Cir.2001).

. Id.

. Jadcsonville Terminal Co., 394 U.S. at 381, 89 S.Ct. 1109.

. Longshoremen are only covered by the Railway Labor Act if they are employees of a carrier. See 45 U.S.C. § 151.

. Longshoremen Out on Strike; Shipping Halted, The Seattle Daily Times, May 9, 1934, at 10. This and other issues of The Seattle Daily Times cited in this opinion are available online through the newspaper collections of the Hairy Bridges Center for Labor Studies, University of Washington, http://depts. washington.edu/dock/34strike_news_ coverage.shtml.

. Alaska Mail Held; Sound Mills Quit; U.S. Action Asked, The Seattle Daily Times, May 15, 1934, at 1.

. Strikers Receive Ultimatum; To Load U.S. Alaska Ship, The Seattle Daily Times, May 24, 1934, at 10.

. Ryan’s Order to Relieve Alaska is ‘Mandatory,’ The Seattle Daily Times, May 25, 1934, at 15.

. 3,000 Back on Job Here As Maritime Tie-Up Ends, The Seattle Daily Times, July 31, 1934, at 1.

. Strikers Work in All Ports on Pacific Coast, The Seattle Daily Times, July 31, 1934, at 5.

. Id.

. See Nat’l R.R. Passenger Corp. v. Transport Workers Union of America, 373 F.3d 121 (D.C.Cir.2004); Burlington N. & Santa Fe Ry. Co. v. BMWE, 286 F.3d 803 (5th Cir.2002); Delta Air Lines, Inc., v. Air Line Pilots Ass’n, Int’l, 238 F.3d 1300 (11th Cir.2001).

. Delta Air Lines, 238 F.3d at 1307.

. Id. at 1308 (quoting § 152, First).

. Id. at 1302.

. Id. at 1309.

. Id. at 1309.

. Id. at 1311 (citing § 152, First).

. Nat’l R.R. Passenger Corp., 373 F.3d at 127.

. Id. at 123.

. Id. at 126.

. Id. at 122.

. Id. at 123 (internal quotations omitted) (emphasis in original).

. Id. at 126.

. Id. (internal quotations omitted).

. 286 F.3d 803, 807 (2002) (quoting 45 U.S.C. § 152, First) (citation omitted).

. Id.

. See Delta Air Lines, 238 F.3d 1300; accord Burlington N. & Santa Fe Ry. Co., 286 F.3d 803.

. See Nat’l R.R. Passenger Corp., 373 F.3d at 123.

. United Air Lines, Inc. v. Int'l Ass’n of Machinist & Aerospace Workers, 243 F.3d 349, 365 n. 11 (7th Cir.2001) (quoting Air Line Pilots Ass’n v. United Air Lines, Inc. 802 F.2d 886, 901 (7th Cir. 1986)).

. Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R. Co., 385 F.2d 581, 614 (D.C.Cir. 1967).

. 398 F.2d 443, 447 (1968).

. 320 U.S. 323, 335, 64 S.Ct. 146, 88 L.Ed. 76 (1943) (quoting Virginian Ry. Co. v. Sys. Fed’n No. 40, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937)).

. Id. at 329-30, 64 S.Ct. 146.

. Id. at 330, 64 S.Ct. 146.

. 45 U.S.C. § 152, Third, Ninth.

. Id. § 152, Fifth.

. Id. § 152, Ninth.

. 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943).

. 45 U.S.C. § 152, Twelfth.