Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 21, 2004        Decided July 2, 2004

No. 03-7185

NATIONAL RAILROAD PASSENGER CORPORATION,
APPELLANT

v.

TRANSPORT WORKERS UNION OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02010)

*Thomas E. Reinert, Jr.* argued the cause and filed the briefs for appellant.

*Edward Himmelfarb*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellant. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney, *William G. Kanter*, Attorney, *Jeffrey*

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*A. Rosen*, General Counsel, U.S. Department of Transportation, and *Paul M. Geiger*, Assistant General Counsel.

*Richard S. Edelman* argued the cause and filed the brief for appellees.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Amtrak appeals an order of the district court denying its motion to enjoin five unions from conducting a one-day strike. Amtrak argues the district court should have enjoined the strike as a violation of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* The Unions argue the RLA is inapplicable because the strike does not concern matters at issue in bargaining between Amtrak and the Unions but rather is directed at the Congress and the President. The United States appears as *amicus curiae* in support of Amtrak. Because we reject the factual premise of the Unions' argument, we hold the strike must be enjoined pursuant to the RLA, for which purpose we remand this matter to the district court.

## I. Background

In the fall of 2003 Amtrak announced it would be forced to shut down if it received a congressional subsidy of less than $1.8 billion for FY 2004. Meanwhile, the House of Representatives had passed a bill appropriating $900 million for Amtrak while the Senate had passed a bill providing $1.3 billion. After Amtrak's announcement, five unions representing Amtrak employees put out press releases saying they would stage a "work stoppage" in order to protest "the Bush Administration and Congress' refusal to properly fund Amtrak." The Unions' stated goal was to publicize Amtrak's bid for increased appropriations and to show the public what would happen if Amtrak were to shut down.

At the time the Unions announced their plan they were (as they are still) engaged in negotiation or mediation with Amtrak over the terms of new collective bargaining agree-

ments. Amtrak sought to enjoin the strike on the ground that the RLA prohibits self-help during the negotiation of a new collective bargaining agreement. The Unions agreed to refrain from the strike until after the district court had decided Amtrak's motion for a preliminary injunction. Meanwhile, Amtrak's President, David Gunn, had told the Congress the railroad needed at least $1.3 billion — $500 million less than previously claimed — and the House and the Senate had agreed in conference to provide Amtrak $1.22 billion in FY 2004.

The district court denied Amtrak's motion for a preliminary injunction, stating the RLA "does not impose an absolute bar against strikes" during collective bargaining but instead "establishes procedures for channeling disputes into a dispute resolution process." *Nat'l R.R. Passenger Corp. v. Transp. Workers Union*, 294 F. Supp. 2d 60, 64 (D.D.C. 2003). The district court held the RLA did not bar this strike because the Unions' "dispute with Congress and with the administration over Amtrak funding *cannot be resolved by negotiation, mediation, or arbitration with Amtrak*." *Id.* (emphasis in original). The district court further held the RLA should not be construed to prohibit "self-help with respect to any dispute with anybody for any reason" during collective bargaining because then the railroad would be entitled "to an injunction as a matter of law, regardless of the unions' purpose," *id.* at 66, that is, even if the strike was directed at the political process rather than the process of collective bargaining. Amtrak appealed, and the Unions again agreed to refrain from striking until this court has ruled.

## II. Analysis

The issue on appeal is whether the Unions' proposed strike violates the RLA. If it does, then the district court must enjoin it; if it does not, then the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.*, precludes the district court from enjoining it. *See Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 42 (1957) ("[T]he specific

4

provisions of the [RLA] take precedence over the more general provisions of the Norris–LaGuardia Act").

The goal of the RLA is ambitious: "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions," 45 U.S.C. § 151a(4), in order to "avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a(1). To that end § 2 First of the RLA, 45 U.S.C. § 152 First, obligates carriers and the unions that represent their employees to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." *See Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 153 (1969) ("The obligation of both parties . . . is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute").

The RLA applies to two types of disputes between a carrier and a union representing its employees. A "major dispute" concerns changes in "rates of pay, rules, or working conditions," 45 U.S.C. § 151a(4), and relates to "the formation of collective bargaining agreements or efforts to secure them." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). A "minor dispute" involves a controversy over the "interpretation or application of [an] agreement[ ] covering rates of pay, rules, working conditions." 45 U.S.C. § 151a(5). In short, "major disputes seek to create contractual rights, minor disputes to enforce them." *Hawaiian Airlines*, 512 U.S. at 253 (quoting *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989)). Amtrak and the Unions are presently engaged in a "major dispute" over the content of new collective bargaining agreements.

The RLA establishes a sequence of mandatory procedures for the resolution of a major dispute. The initial step is

negotiation between the carrier and the union. *See* 45 U.S.C. § 152 Second. If negotiation fails, then the dispute is referred to the National Mediation Board. *See* 45 U.S.C. § 156. If the NMB fails to mediate the dispute and if it determines the dispute "threaten[s] substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," then the President may create an emergency board to arbitrate the dispute and to "report [to the President] respecting such dispute." 45 U.S.C. § 160. If arbitration fails, then there is a mandatory 30-day "cooling-off" period during which "no change" may be made by either side to "the conditions out of which the dispute arose." *Id.* These exhaustive provisions "form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day 'cooling-off' period." *Detroit & Toledo Shore Line R.R.*, 396 U.S. at 152. If, and only if, negotiation, mediation, arbitration, and the cooling-off period fail to produce an agreement, may the parties resort to self-help — the employer by unilaterally changing rates of pay, rules, or working conditions, the union by striking. *See Air Line Pilots Ass'n, Int'l v. Northwest Airlines, Inc.*, 199 F.3d 477, 479 (D.C. Cir. 1999).

In this case, the Unions argue their proposed strike does not "grow[ ] out of" their on-going "major dispute" with Amtrak, 45 U.S.C. § 152 First, and therefore is not subject to the status quo provisions of the RLA. More specifically, they claim the status quo provisions of the RLA are inapplicable because the subject of the work stoppage "is not the subject matter of pending bargaining or mediation," and "is not about rates of pay, rules, or working conditions involved in or related to the dispute subject to bargaining or mediation." The Unions contend the strike is instead directed at policy decisions made by the Congress and the President.

We think it clear that, insofar as the subject matter of the Unions' proposed strike is the level of congressional appropriations for Amtrak, the strike does "grow[ ] out of" the major dispute between Amtrak and the Unions over the formation

of new collective bargaining agreements concerning, among other things, rates of pay and working conditions.

The amount the Congress appropriates for Amtrak's operations determines both the number of employees Amtrak retains and any increases in the level of pay and benefits those employees may receive. This had been the Unions' expressed view prior to the present litigation. For example, Charles Moneypenny, Railroad Division Director of the Transport Workers Union, stated in a letter to the local TWU chapters that the proposed work stoppage

> is not a pro-Amtrak event. It is a pro-railroad worker event. If passenger rail is not properly subsidized . . . there just will not be any jobs for our hard-working, long-suffering Amtrak members. The collapse of our national passenger rail system would also cripple our Railroad Retirement System.

The Unions also related appropriations for repairs and other capital improvements in Amtrak's equipment and tracks to the safety of union members on the job. Thus, Mr. Moneypenny testified before the district court that the TWU was "concerned about how [the appropriations process] could affect the safety of employees." In their press release the Unions also quoted the statement by Amtrak President David Gunn: "[O]n any given day something could fail — as it already has — and large parts of the system could be shut down." The press release further warned Amtrak employees, "Some of the cars you ride in today contain asbestos; it's there because Amtrak cannot afford to remove it safely."

Finally, a letter written by Sonny Hall, President of the TWU, to David Gunn demonstrates that the Unions' effort to secure increased congressional appropriations for Amtrak grows out of its dispute over "rates of pay" and "working conditions." The TWU, he wrote, expected the appropriation sought by Amtrak would provide "not only [for] the maintaining and improvement of the physical structure of Amtrak, but the human structure as well"; it should "result in a fair, and honest new Labor agreement with rail unions and a commitment to Amtrak employees that they are at least as important

as safe equipment and track bids [sic]." Even in their brief to this court the Unions characterize this letter as "a statement that Amtrak should not come looking to the unions for concessions because it had just reduced its request for appropriations by $500 million." In sum, there can be no doubt the planned strike over the level of the congressional appropriation for Amtrak "grow[s] out of" the dispute over pay and working conditions presently in negotiation or mediation between Amtrak and the unions. Because the proposed strike grows out of a major dispute concerning rates of pay and working conditions, the parties must exhaust the procedures of the RLA before either may resort to self-help such as a strike.

The planned strike is also addressed in part to a non-mandatory subject of bargaining, namely, curtailment or complete discontinuance of Amtrak's operations. In fact, the Unions' proclaimed purpose for striking was to show the Congress and the public what life would be like if Amtrak were shut down due to lack of funding by the Congress. The Unions, which considered the Congress's failure fully to fund Amtrak's request "a death sentence" for the railroad, planned their work stoppage in part to dissuade the Congress from "kill[ing] Amtrak." A decision either by Amtrak itself or by the Congress to curtail or to eliminate Amtrak's operations, however, is a non-mandatory subject of bargaining, within the sole discretion of management. *See Pittsburgh & Lake Erie R.R. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 507–08, 509 (1989) (elimination of operations is "not a change in the conditions of employment forbidden by the status quo provision of § 156"); *see Ry. Labor Executives' Ass'n v. CSX Transp.*, 938 F.2d 224, 229 (D.C. Cir. 1991) ("the railroad's 'freedom to leave the market' . . . by terminating an operation or selling assets, is a matter of managerial prerogative").

Under the NLRA, "a strike or other economic action in support of a proposal on a nonmandatory subject of bargaining is unlawful." *Detroit Newspaper Agency*, 327 NLRB 799, 800 (1999); *see NLRB v. McClatchy Newspapers, Inc.*, 964 F.2d 1153, 1154 (D.C. Cir. 1992) (Edwards, concurring) ("unilateral action may not be taken with respect to nonmandatory

subjects of bargaining"). Although "[e]ven rough analogies [between the RLA and the NLRA] must be drawn circumspectly," *Brotherhood of Railroad Trainmen v. Jacksonville Terminal, Co.*, 394 U.S. 369, 383 (1969), "the use of the mandatory-permissive distinction under the RLA is entirely consistent with its statutory framework," *Air Line Pilots Association International v. United Air Lines, Inc.*, 802 F.2d 886, 902 (7th Cir. 1986), and has been adopted by several circuits, including this one. *See Northwest Airlines*, 199 F.3d at 479; *United Air Lines*, 802 F.2d at 902; *Japan Air Lines Co. v. Int'l Ass'n Machinists & Aerospace Workers*, 538 F.2d 46, 52 (2d Cir. 1976). Therefore, "[i]nsofar as the [U]nions want to strike merely to protest a transaction" that "does not violate any of their statutory or contractual entitlements, they are using an unauthorized self-help remedy, which violates the Act and is therefore enjoinable." *Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 157 (7th Cir. 1990). To permit the Union to strike with regard to that non-mandatory subject, at least during the pendency of a major dispute, would be to subvert the rationale of *Pittsburgh & Lake Erie*, which is to preserve managerial discretion over these matters. *See* 491 U.S. at 507-08.

In any event, as the Government correctly points out, even if the strike were "designed to influence [only] the Government," and not the formation of new collective bargaining agreements, a politically motivated strike has the "same adverse effect on interstate commerce" as a "strike motivated by more conventional labor concerns." Call it a political protest rather than a strike; no matter: When the RLA prohibits a strike it also prohibits any union tactic "which has the consequences of a strike." *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986). This strike — which the Unions admitted at oral argument could, if it is lawful, be called not for a day but until such time as the Congress meets the Unions' demands — would put "severe economic pressures on [Amtrak], thereby undermining its bargaining position during the period of negotiation and mediation. This is precisely the kind of action that the RLA status quo provisions seek to prevent." *United Air*

*Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 365 (7th Cir. 2001).

The Unions also argue that "if a dispute is not amenable to resolution through the dispute resolution processes provided by the RLA, then there is no RLA bar on concerted activity and no status quo obligation applies." The Government, supported by Amtrak, responds with the "possibility that a politically tinged dispute cannot be 'resolved' by negotiation does not warrant a wholesale exception to the mandates of the RLA."

Insofar as the Unions' planned strike grows out of the major dispute between Amtrak and the Unions, however, it is indeed subject to resolution through RLA procedures, starting with bargaining between the Unions and Amtrak over rates of pay and working conditions. Insofar as the strike also relates, in part, to a non-mandatory subject of bargaining, namely, the Employer's prerogative either to curtail or to eliminate operations, the RLA prohibits the Unions from striking even though the dispute is not amenable to resolution via the procedures of the RLA. If the strike did not grow out of a major dispute or concern a management prerogative — like the protest regarding the Soviet invasion of Afghanistan at issue in *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, 457 U.S. 702 (1982) — then the Unions would not be restrained by the status quo provision for major disputes. That is simply not the case here, however, because Amtrak and the Unions are in the midst of a major dispute, the strike in fact grows out of that dispute, and is in part directed to the Employer's prerogative to cease operations.

### III.  Conclusion

For the foregoing reasons, we hold the Unions' proposed strike must be enjoined pursuant to the RLA. The order of the district court is therefore reversed and this matter is remanded to the district court for the entry of appropriate relief.

*So ordered.*