# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 7, 2018        Decided July 5, 2019

No. 17-7172

ATLAS AIR, INC. AND POLAR AIR CARGO WORLDWIDE, INC.,
APPELLEES

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01953)

*Edward M. Gleason, Jr.* argued the cause for appellants. With him on the briefs were *James Petroff* and *Trent R. Taylor. Joshua D. McInerney* entered an appearance.

*Robert A. Siegel* argued the cause for appellees. With him on the brief were *Rachel Janger*, *Michael G. McGuinness*, and *Sloane Ackerman*.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The district court issued a preliminary injunction enjoining a union's efforts to gain leverage over two commercial air carriers during negotiations over an amended collective bargaining agreement. Congress permits courts to issue such injunctions in rare circumstances. Because this is one of them, we affirm.

I

Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (collectively, "Atlas") are global commercial air carriers that operate domestic and intercontinental flights for the U.S. military, DHL, and Amazon, among others. Atlas's pilots are represented by the International Brotherhood of Teamsters; the International Brotherhood of Teamsters, Airline Division; and the Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224. We refer to them collectively as the "Union."

In 2011, after a protracted negotiation process, the Union and Atlas entered into a collective bargaining agreement (CBA). The CBA prohibits the Union from engaging in a work stoppage or slowdown and permits Atlas to seek an injunction if the Union does so. The CBA also creates a process to resolve any "grievance[s]" that Atlas has over the "interpretation or application" of its provisions. Defs.' Ex. 1 at 126-27, No. 17-cv-1953 (D.D.C. Nov. 30, 2017), Dkt. No. 31-1.

Since entering the CBA, Atlas's business model and staffing demands have changed significantly because of the rapid expansion of e-commerce. In the past, most of Atlas's business was international. Of late, the company's focus has shifted to a growing domestic market. The Union tried to work "collaboratively with Atlas" to alleviate the growing pains caused by this change rather than holding the company

"accountable" to the precise terms of the CBA. J.A. 172-73. But as domestic operations expanded, pilots' frustrations increased. In 2014, the pilots elected a new Chairman of the Atlas Pilots' Executive Committee, the body through which the Union manages day-to-day representation of the pilots. Captain Robert Kirchner ran on a platform calling for "strict contract compliance." J.A. 173. As he explained, if Atlas is "allowed to bend and violate the terms of the [CBA] when it suits them, [the company] will have no reason to negotiate changes to the [CBA]" when it becomes amendable. *Id.* When he assumed the role of Chairman in January 2015, Captain Kirchner launched several communication tools to help educate pilots about their rights and responsibilities under the CBA: "Atlas Teamsters Action Message" podcasts (ATAM), "Atlas Pilots Crew Call" question and answer sessions, "Chairman's Update" emails, and "CBA Chat" videos.

On February 16, 2016, about one year after Captain Kirchner took office, the Union notified Atlas that it would seek to amend the existing CBA. Around that same time, the Executive Committee's communications efforts picked up steam. The day before the Union issued that notice, the Communications Chairman, Captain Michael Griffith, asked rhetorically on an ATAM, "Are you going to continue[] to sell your talents for a quick buck, or are you going to stop doing the Company favors and follow the CBA to the letter and give your [Executive Committee] and Negotiation Committee the leverage and power they need today?" J.A. 638. Over the coming months, the Union repeatedly called on pilots to be "all in," "fly the CBA," and "fly the contract." *E.g.*, J.A. 631, 650; Pls.' Ex. 51 at 3, No. 17-cv-1953 (D.D.C. Nov. 30, 2017), Dkt. No. 5-54; Pls.' Ex. 100 at 54, No. 17-cv-1953 (D.D.C. Nov. 30, 2017), Dkt. No. 27-4. It encouraged pilots to "SHOP," or "stop helping out Purchase," named for the location of Atlas's headquarters in Purchase, New York. *E.g.*, J.A. 640. According

to Captain Kirchner, "SHOP" or "shopping" refers to the idea that pilots should not "help out" Atlas "by permitting [it] to get away with contract violations," but should instead insist on "strict contract compliance." J.A. 178. The Union asked pilots to "BOOT," which stands for "block out on time." *E.g.*, J.A. 652. By contrast, Atlas encourages pilots to "block out"—*i.e.*, push back from the gate—up to fifteen minutes early as a matter of course, or even earlier with Atlas's approval. The Executive Committee also encouraged pilots to think more carefully about when to call in sick or accept overtime work.

Atlas was unhappy with these efforts and the changes it began to see in pilots' behavior. Atlas viewed SHOP and BOOT as part of a Union attempt to orchestrate a work slowdown in an attempt to ratchet up pressure on Atlas during their negotiations over an amended CBA. When Atlas could not convince the Union to stop this behavior, the company asked the district court for an injunction. The Union disputed Atlas's allegations and moved to dismiss for lack of jurisdiction. After a three-day evidentiary hearing, the district court determined that it had jurisdiction and entered a preliminary injunction to prevent the Union from encouraging pilots to "block out on time," call in sick on short notice, and refuse to volunteer for overtime shifts. *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59 (D.D.C. 2017). The Union appealed. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) and 29 U.S.C. § 110.

II

We begin by asking whether the district court had jurisdiction to issue this type of preliminary injunction. Our review is de novo. *Foretich v. Am. Broad. Cos.*, 198 F.3d 270, 273 (D.C. Cir. 1999). To answer that question, we look to the Railway Labor Act and the Norris-LaGuardia Act.

5

A

In the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, Congress established different procedures to resolve two types of labor disputes in the transportation industry, which we refer to as major and minor disputes. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n* (*Conrail*), 491 U.S. 299, 302 (1989). A major dispute concerns the formation or amendment of a collective bargaining agreement. *Id.* The process for resolving a major dispute is complex and typically takes a long time. Only once that process is complete may the company or the union alter the status quo by engaging in a work slowdown or stoppage. *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969). Delaying the time at which labor or management may use economic self-help encourages compromise and prevents interruptions to commerce or carriers' operations. *Id.*; *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 149-50 (1969); *see* 45 U.S.C. § 152, First. The status quo requirement is thus at the "heart" of the RLA, and may be enforced by injunction. *Jacksonville Terminal*, 378 U.S. at 377-78; *see* 45 U.S.C. § 152, First; *Conrail*, 491 U.S. at 302-03.

By contrast, a minor dispute involves a question about how to interpret an existing collective bargaining agreement, like the meaning of a term or whether the agreement permits a certain action. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). As long as the contested "action is arguably justified by the terms of the parties' collective-bargaining agreement," we treat the dispute as minor. *Conrail*, 491 U.S. at 307; *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.* (*Eastern*), 869 F.2d 1518, 1521 (D.C. Cir. 1989). The resolution process for a minor dispute is less involved, and there is no "general statutory obligation . . . to maintain the status quo" while that

process is ongoing. *Conrail*, 491 U.S. at 304. So although "[c]ourts may enjoin strikes arising out of minor disputes" in limited circumstances, they generally may not enjoin other violations of the status quo. *Id.* If in doubt, the dispute is minor. *Eastern*, 869 F.2d at 1521.

Labor disputes are also subject to the Norris-LaGuardia Act (NLGA), 29 U.S.C. § 101 *et seq.*, which Congress enacted in response to concerns that federal courts were using their injunctive power too often to the detriment of workers. *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 40 (1957). To curtail such judicial interference, Congress stripped federal courts of "jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute, except in . . . strict conformity" with various procedural requirements. 29 U.S.C. § 101. The NLGA also categorically eliminates jurisdiction to enjoin certain types of conduct in "any labor dispute," including work stoppages and slowdowns. *Id.* § 104.

We cannot have jurisdiction to enjoin slowdowns or work stoppages in major labor disputes in the transportation industry, *see* 45 U.S.C. § 152, yet at the same time lack jurisdiction to enjoin such conduct in "any labor dispute," 29 U.S.C. § 104. More than 50 years ago, the Supreme Court resolved this conflict by holding that "the specific provisions of the [RLA] take precedence." *Chi. River*, 353 U.S. at 41-42, 41 n.23. Courts therefore have jurisdiction to issue injunctions to preserve the status quo in major disputes in the transportation industry, *Conrail*, 491 U.S. at 302-03, but in keeping with the goals of the NLGA, they should only do so if "that remedy alone can effectively guard the plaintiff's right[s]," *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 773 (1961). In order to verify that such an RLA injunction is indeed essential, courts must generally comply with the procedures set forth in the

NLGA before issuing RLA injunctions. *See* 29 U.S.C. §§ 101, 105-109; *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers* (*United*), 243 F.3d 349, 362 n.9 (7th Cir. 2001); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1307, 1310 (11th Cir. 2001).

B

The Union sees this as a minor dispute. In its view, the question of whether the Union's conduct is permissible concerns how best to interpret or apply the existing CBA, and such grievances about the CBA's interpretation or application must be resolved using the specific procedures outlined in that agreement. So because the Union has demonstrated that the existing CBA "arguably resolves the dispute one way or another," the dispute is minor. *See* Union Br. 23. Atlas, by contrast, claims this is a major dispute because the Union encouraged pilots to push back from the gate exactly on time, call in sick on short notice, and decline overtime *in order to* pressure Atlas in negotiations for an amended CBA.

The district court agreed with Atlas, and so do we. A dispute over the terms of a new or amended collective bargaining agreement is unequivocally major. *E.g.*, *Nat'l R.R. Passenger Corp. v. Transp. Workers Union of Am.* (*Amtrak*), 373 F.3d 121, 123 (D.C. Cir. 2004). So too is a dispute over conduct that "grows out of" the effort to negotiate that agreement. *Id.* at 125-26 (where a proposed strike over Amtrak's funding "gr[ew] out of" a dispute over the terms of a new collective bargaining agreement, and both the strike and agreement would alter pay and working conditions, the strike "gr[ew] out of" the major dispute). This makes perfect sense: The purpose of the RLA's status quo requirement is to maintain the parties' respective positions while they negotiate future rights. *See id.* at 123. When one party alters the status quo in

order to put "economic pressure[]" on the other to enhance its own bargaining position, that conduct is part of a major dispute and may be enjoined. *United*, 243 F.3d at 365 (finding that a general slowdown campaign, which was designed to pressure United during negotiations for a new collective bargaining agreement, constituted a major dispute); *accord Delta*, 238 F.3d at 1307-08 (same, with respect to concerted effort to decline overtime); *see also Long Isl. R.R. Co. v. Sys. Fed'n No. 156*, 368 F.2d 50 (2d Cir. 1966) (affirming order enjoining union exhortations to "follow the rules strictly"). That is precisely what Atlas alleges happened here.

This is not a case about whether the existing CBA arguably permits the Union or its members to act in this manner, or whether the CBA establishes a process to resolve disputes about its interpretation. In fact, Atlas has consistently maintained that this dispute cannot be resolved by the existing agreement, and has disclaimed any reliance on the provision in the CBA that prohibits slowdowns for purposes of this case. *Cf. Conrail*, 491 U.S. at 311-12 (finding the dispute to be minor where both parties' arguments relied on the meaning of the existing agreement, and whether a certain practice was impliedly justified by that agreement); *Eastern*, 869 F.2d at 1524 (same, where both parties invoked a specific provision in the existing agreement to justify their positions). Rather, as the district court explained, this is a dispute "about whether the Union may engage in a concerted campaign to alter the status quo (by SHOP-ing, BOOT-ing and the like) in the midst of what is unmistakably a major dispute (the negotiation of [an amended] CBA) in order to apply economic pressure on the company in those negotiations." *Atlas Air*, 280 F. Supp. 3d at 80-81. Because the existing CBA does not even arguably speak to whether this conduct is permissible when done in furtherance of that particular goal, this is a major dispute.

Atlas has presented compelling evidence in support of its assertion that this is a major dispute. The Union's own statements demonstrate that it frequently encouraged pilots to take the very actions Atlas challenges as a means to gain leverage in the negotiations over amending the CBA. *See Amtrak*, 373 F.3d at 124-25 (looking to unions' words and deeds to confirm Amtrak's assertion that the dispute was major). In ATAMs, Captain Griffith encouraged pilots to "follow the CBA to the letter and give [the Executive Committee] and Negotiation Committee the leverage and power they need," J.A. 638, and explained that "[SHOP] goes hand-in-hand with following the CBA," J.A. 640. The same month the Union and Atlas finalized a negotiation protocol for the amended CBA, Captain Kirchner told pilots to continue their efforts to "SHOP, BOOT and push back on [Atlas's] tactics harder than ever as we are starting to get the movement we desire." J.A. 728. Don't "start violating the CBA," "resign yourselves to the status quo," or "abandon our quest for an industry-leading CBA," he implored. *Id.* Combined with the additional examples in the record and district court opinion, *see infra*, Part III.A; *Atlas Air*, 280 F. Supp. 3d at 78-79, 90-92, 97-98, 101, Atlas has presented sufficient evidence to demonstrate, for purposes of jurisdiction, that the challenged actions grew out of the major dispute, *see Amtrak*, 373 F.3d at 124-25; *United*, 243 F.3d at 363; *Delta*, 238 F.3d at 1307-08.

The Union claims, however, that sections 8 and 7(e) of the NLGA stripped the district court of its jurisdiction to enter this injunction. Section 8 provides that a court may not enter an injunction in a case involving a "labor dispute" if the plaintiff "has failed to make every reasonable effort to settle [that] dispute." 29 U.S.C. § 108. Section 7(e) strips a court of "jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute" unless the court specifically finds "[t]hat the public officers charged

with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." *Id.* § 107(e). The Union is correct that these provisions can strip a court of jurisdiction in a major dispute. *See supra*, Part II.A; *Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R. Co.*, 385 F.2d 581, 613-14 (D.C. Cir. 1967) (NLGA section 8); *Green v. Obergfell*, 121 F.2d 46 (D.C. Cir. 1941) (NLGA section 7(e)). But not here.

Atlas has shown that, as required by section 8 of the NLGA, it made "every reasonable effort to settle [this] dispute." 29 U.S.C. § 108. Again, Atlas and the Union disagree about how to characterize this labor dispute: Atlas says that it needed to exert every reasonable effort to resolve the dispute over the terms of the amended CBA, and has done so. The Union disagrees and asserts that "[t]he NLGA 'labor dispute' between the parties . . . is *indisputably* over whether an improper slowdown occurred under the parties' existing CBA." Union Reply 14. To resolve that dispute, Atlas had to use the "mandatory grievance and arbitration procedures" in the CBA and RLA, among other things. Union Br. 34-36. It did not, and the Union argues that the district court accordingly lacked jurisdiction because "[t]he RLA 'clearly states' that this arbitration requirement is jurisdictional" and that "[f]ederal courts have no jurisdiction over RLA 'minor' disputes such as this one." *Id.* at 22 (first quoting *Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 237 (D.C. Cir. 2013), and citing *Conrail*, 491 U.S. at 304). The problem with the Union's argument is that it is based on the assumption that this case involves a "minor dispute" requiring interpretation of the parties' CBA which, as we have already explained, is incorrect.

The Union also argues that, per the CBA, Atlas must file a grievance with the Union and submit to arbitration its claim that the Union is directing an unlawful slowdown *before* the

company can seek an RLA injunction in federal court. *See* 45 U.S.C. § 152, First. Because Atlas has not done so, it cannot satisfy NLGA section 8. We find no merit in the Union's claim, which is based on a "frivolous or obviously insubstantial" reading of the CBA. *Conrail*, 491 U.S. at 307, 310. The relevant section of that agreement provides:

> [T]he Union . . . agrees that during the term of the [CBA] there will not be any complete or partial strikes, picketing, [or] slowdowns . . . unless and until the parties' rights to self-help mature under the Railway Labor Act . . . . *This paragraph shall not alter or limit [Atlas's] right, if any, to obtain a court order enjoining such conduct by the Union and or the [pilots] both collectively and individually.*

J.A. 624 (emphasis added). As Atlas correctly notes, this provision "reflects an agreement that the contractual no-strike clause [would] be in addition to, and not in lieu of," Atlas's right to ask a federal court for a status quo injunction under the RLA. Atlas Br. 39 n.7. The Union offers no convincing response to these arguments. Thus, Atlas was not required to pursue the grievance/arbitration process set forth in the CBA before asking a court to enjoin the Union's concerted actions.

We agree with the district court that Atlas has made every reasonable effort to resolve its disputes with the Union. *Atlas Air*, 280 F. Supp. 3d at 85-86. With respect to the terms of the amended CBA, the parties began negotiating in 2016; mediated, arbitrated, and litigated a dispute related to those negotiations; worked for eight months to create a framework to govern the negotiation process; then spent about two and a half months in negotiations before Atlas filed this complaint. *See id.* at 72-73 (describing these efforts). Moreover, the district court found that Atlas "made efforts to resolve the slowdown short of litigation," as demonstrated by communications with

the Union and its counsel. *Id.* at 86. As the district court found, on the present record, that is sufficient. *Id.* at 85-86; *see United*, 243 F.3d at 364-65; *see also Grand Trunk W. R.R. Inc. v. Bhd. of Maint. of Way Emps. Div.*, 497 F.3d 568, 572-73 (6th Cir. 2007) (finding section 8 satisfied where parties engaged in unsuccessful negotiations more than once); *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1238-39 (9th Cir. 1997) (same); *cf. Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1078 (9th Cir. 2015) (en banc) (section 8 not satisfied where one party sought an injunction before attempting to settle or negotiate with the other).

Furthermore, even though section 7 of the NLGA applies to all cases "involving or growing out of a labor dispute," courts have consistently interpreted subsection (e) to apply only where one party has threatened violence against the person or physical property of another. *Donnelly Garment Co. v. Dubinsky*, 154 F.2d 38, 43 (8th Cir. 1946); *Carter v. Herrin Motor Freight Lines*, 131 F.2d 557, 561 (5th Cir. 1942); *Wilson & Co. v. Birl*, 105 F.2d 948, 950 (3d Cir. 1939). As the Third Circuit explained, "it would be unreasonable to construe [this] subsection to include losses which . . . the powers of the police are hardly calculated to prevent," like the loss of one's customers because of strikes or picketing. *Wilson*, 105 F.2d at 949-50. The one case from our court that the Union cites in support of this argument fits with this rule. *See Green*, 121 F.2d at 53-54 (finding that the district court lacked jurisdiction because the record "show[ed] violence and destruction of property" but there was no evidence that the public officers were "unable or unwilling to furnish adequate protection"). As the present record does not contain any evidence of threatened or actual violence to Atlas's persons or property, section 7(e) is no bar to the district court's authority to enjoin the Union's conduct. *Accord Atlas Air*, 280 F. Supp. 3d at 87.

13

III

In general, a plaintiff seeking a preliminary injunction must show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent such relief; (3) that the equities favor the plaintiff's position; and (4) that the injunction is in the public's interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). *But see Conrail*, 491 U.S. at 303 (courts may enjoin status quo violations in major RLA disputes without a showing of irreparable injury). We review the issuance of a preliminary injunction for abuse of discretion, although we review the court's underlying legal conclusions de novo and factual findings for clear error. *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999). "A factual finding is clearly erroneous if it is 'without substantial evidentiary support or if it was induced by an erroneous application of the law.'" *Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc.*, 863 F.2d 891, 894 (D.C. Cir. 1988) (quoting *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985)).

Because the Union's argument on appeal is confined to the question of whether Atlas has demonstrated a likelihood of success on the merits, our analysis is as well. *See Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014) (issues not raised in opening briefs are forfeited).

A

To demonstrate a likelihood of success in this kind of case, Atlas must show that the status quo changed during a major dispute in violation of the RLA, *see* 45 U.S.C. § 152, First, and provide "clear proof" that the Union participated in, authorized, or encouraged that change, 29 U.S.C. § 106; *see United*, 243 F.3d at 363-66; *Delta*, 238 F.3d at 1309 & n.21.

To determine whether the Union encouraged a change in the status quo during a major dispute, we must know when that dispute began. The Union says it started in January 2015 when Captain Kirchner was elected head of the Executive Committee and began "to educate the pilots about their contractual rights and regulatory responsibilities." Union Br. 6; *see id.* at 43-45. It was in that context that he started calling for strict CBA compliance. In Atlas's view, the relevant date is February 2016, when the Union notified Atlas of its intent to negotiate an amended CBA, intensified its messaging campaign, and announced SHOP and BOOT. It is clear from the district court's analysis that the court agreed with Atlas. *See Atlas Air*, 280 F. Supp. 3d at 78-103. We do as well. As we have explained, this case is about a major dispute over the terms of an amended CBA. That dispute began in February 2016.

Of course, a union is allowed to educate its members about their contractual rights and safety obligations, and in that context, it may not be a problem to call for strict compliance with the contract. A union may not, however, encourage strict compliance with the terms of an existing agreement in an effort to gain leverage in negotiations for a new or amended contract. When a union changes the status quo in aid of such an effort, the district court may enjoin the union's conduct. That is just what happened here with respect to blocking out, short-notice sick calls, and overtime.

## 1. Blocking Out On Time

Atlas asserts that pilots were substantially more likely to block out (*i.e.*, push back from the gate) precisely on time after the Union notified Atlas of its intent to negotiate an amended CBA. Departing exactly on time, as opposed to when the aircraft is "loaded and ready," removes any potential "buffer,"

meaning the flight is more likely to arrive late if it encounters other issues, like headwinds or congestion. *Id.* at 100-01. This threatens to cause cascading delays across flights by forcing Atlas to shuffle runways, schedules, and gates, particularly at Atlas's biggest hubs where flights depart every two-to-three minutes.

Atlas's expert, Dr. Lee, presented statistically significant evidence showing that from January 1, 2012 to February 15, 2016, nearly 80% of flights blocked out early and 13% blocked out precisely on time. J.A. 464-67 (Lee Decl.). This consistently low percentage of precisely on-time departures reasonably suggests that pilots were not waiting to depart until scheduled. But from February 16, 2016 to August 2017, about 34% of flights blocked out early and 53% blocked out precisely on time. *Id.* In addition, since February 2016, "the percentage of flights blocking out twenty-five or more minutes before the [estimated departure time] dropped from 12.1% to 3.3%," and "flights unaffected by other delays have blocked out an average of six minutes less early." *Atlas Air*, 280 F. Supp. 3d at 100 (citing Dr. Lee's analysis). Notably, these statistics exclude flights delayed for reasons outside Atlas's control, like weather or customer requests, and flights experiencing cascading delays.

The Union's responses to this compelling evidence lack merit.[1] First, the Union disputes the reliability of Dr. Lee's

[1] The Union objects that the district court did not make separate, explicit findings about what constituted the pre-dispute status quo with respect to any of the challenged conduct. While true, we detect no error. Courts resolving these type of cases do not typically make such express findings; instead, they compare statistics about challenged behaviors from before and after the relevant dividing time. *See generally United*, 243 F.3d at 354-55, 363; *Delta*, 238 F.3d at 1310-11. This approach makes perfect sense to us. As the Union

analytical models. He used departure delays, but in the Union's view, arrival delays are a better metric because that is what customers care about. The Union's expert, Daniel Akins, found that Atlas's "poor on-time [arrival] performance predates" the Union's February 16, 2016 notice, pursuant to section 6 of the RLA, that it wished to negotiate an amended CBA ("section 6 notice"). Union Br. 12 (citing Mr. Akins's analysis); *see* 45 U.S.C. § 156. The Union therefore reasons that Atlas cannot blame the Union for these changes. The Union also claims that Dr. Lee made up the "loaded and ready" concept; that is not something airlines or pilots track, and Atlas does not have a rule requiring or allowing pilots to depart when the aircraft is "loaded and ready." Union Br. 11-12.

As the district court found, there were good reasons for Dr. Lee to use departure time. Customers may be primarily concerned with arrival times, but the BOOT campaign encouraged pilots to *depart* on time, and departure delays contribute to arrival delays. That is why blocking out as soon as the aircraft is able to depart (*i.e.*, "loaded and ready") is beneficial—it decreases the risk that an aircraft experiencing other delays will arrive late. A pilot who is ready and able to depart early, but instead sits at the gate until the scheduled departure time (*i.e.*, waits to block out on time) cuts down the buffer. Because we agree that departure time is an appropriate metric, whether Atlas's flights arrived chronically late before the section 6 notice is immaterial to whether the BOOT campaign had a statistically significant effect on departure times. As for the Union's objections to the "loaded and ready"

conceded at argument, the status quo includes practices that have developed over time, as reflected by the manner in which the employer or employee actually acts. So if the district court finds—as it did here—that statistical evidence demonstrates that the employer or employee consistently acted in one manner for a given period of time, that can establish a pre-dispute "status quo."

metric, it matters not that Atlas's expert coined this term to explain his analysis to the district court, and that Atlas did not have a formal policy requiring pilots to depart once the plane was "loaded and ready." Since voluntary conduct can be part of the "status quo," the pertinent question in this case is what the pilots normally did before the Union informed Atlas of its intent to negotiate an amended CBA. *See, e.g.*, *Delta Air Lines*, 238 F.3d at 1309-10 (encouraging pilots to decline optional overtime assignments violated the status quo). In other words, the question is what pilots normally did before the Union assertedly began trying to change the status quo. Atlas's statistical evidence shows that, prior to February 2016, pilots frequently departed before the scheduled time and only rarely departed precisely on time, and after February 2016, the inverse was true.

Second, the Union argues that blocking out on time is not illegal, but instead ensures that pilots are "in compliance with [Federal Aviation Administration] rest, flight and duty time regulation[s]." Union Br. 51. That may be so, but the issue is not whether pilots *should* block out on time; it is whether pilots altered their prior practice of blocking out before the scheduled time, when possible. And the answer to that question, the district court fairly concluded, was yes.

Finally, the Union offers various alternative explanations for these changes, including "the increasing complexity and size of [Atlas's] operations," the shift towards employing more junior-level pilots, an "improved emphasis on fatigue training and awareness, and the increasing age of the Atlas fleet." *Id.* at 14. But these ideas would at best shed light on why fewer flights blocked out *before* the estimated departure time. The Union's theories do not explain the significant increase in flights blocking out *exactly* on time—from 13% to 53%. On the present record, the most plausible explanation for this conduct

is the one Atlas offered: even if they were ready earlier, pilots waited to depart until the scheduled time.

Atlas provided clear proof that the Union encouraged pilots to act in this manner. The record is replete with communications from the Union exhorting pilots to stop departing early. For example, on a June 2016 ATAM, Captain Griffith reminded listeners that "the amendable date of our current [CBA]" is approaching, and commended pilots on their efforts to "show[] our particular giant how we can [SHOP] and [BOOT] and even buckle down and say, first you pay me." J.A. 653. In his June 2017 Chairman's Update email, Captain Kirchner told pilots that Atlas believes if it "delay[s] a new CBA long enough, you will . . . abandon our quest for an industry-leading CBA. This cannot be allowed to be the case! YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire." J.A. 728. Another Executive Committee member made the point even more explicit in an August 2017 Crew Call: "Blocking out on time is . . . advantageous to us by giving leverage to our Negotiating Committee and our [Executive Committee] and our stewards." J.A. 769. Given this evidence, the district court did not improperly conclude that Atlas is likely to succeed in demonstrating that by encouraging pilots to "block out on time," the Union altered the status quo.

2. Short-Notice Sick Calls

A "short notice" sick call refers to a pilot's decision not to fly, typically due to illness, made on the same day as the pilot's next scheduled flight. Atlas argues that pilots began calling in sick on short notice at a higher rate after the Union served its section 6 notice. This made it more difficult to find substitute crew members, increasing the risk that flights would be cancelled or delayed.

In support, Atlas provided statistical evidence that, from January 2013 to February 2016, only 14.4% of sick calls were made the same day the pilot was scheduled to fly. J.A. 451 (Lee Decl.). This suggests that pilots were not typically waiting until the day of the scheduled flight to notify Atlas of their unavailability. But from February 2016 to September 2017, that number was 20.4%. *Id.* Because the reason for this percentage change was a spike in short-notice sick calls beginning in October 2016, Atlas's expert also compared statistics from October 1, 2015 to September 20, 2016, and from October 1, 2016 to September 20, 2017. Using those dates, short-notice sick calls increased from 13.8% to 23.8%, while sick calls made at least two days in advance decreased from 44.5% to 31.6%. *Id.* Moreover, during the October 2015 to September 2016 period, the highest percentage of short-notice sick calls in a given month was 18%. *Id.* But from October 2016 to September 2017, the monthly percentage never dropped below 18%, and it exceeded 20% in every month but one. *Id.*

The Union does not challenge the assertion that short-notice sick calls increased in frequency. Instead, the Union argues that "*overall* sick leave usage at Atlas did not increase." Union Br. 54 (emphasis added). But that misses the point. The increased percentage of sick calls made at the last minute supports Atlas's theory that pilots were waiting to call in sick in order to disrupt scheduled flights. The Union also questions the timing of these changes. Of course, a change in behavior in October 2016 does not provide perfect support for Atlas's theory that pilots began acting in this manner in February 2016 in response to this major dispute. But it is unrealistic to expect massive changes in behavior to occur right away, or all at once. *See United Air Lines, Inc. v. Air Line Pilots Ass'n Int'l* (*ALPA*), 563 F.3d 257, 260, 264 (7th Cir. 2009) (affirming injunction

for a "job action that began in 2006 [and] escalated in 2008"). The question, then, is whether Atlas has offered sufficient evidence connecting this statistically significant change to the Union's conduct, or whether the record suggests this occurred for another reason.

That brings us to whether the Union participated in or called for this change in behavior. Of course, there is nothing inherently suspect about a union encouraging its members not to work sick. What *is* suspect is a union reminding its members not to work sick while acknowledging the legal consequences of calling for a sick out and continually emphasizing that strict contract compliance will provide negotiation leverage. Combined, this kind of evidence can fairly be interpreted as encouraging slowdown activities. *See id.* at 272-73 (affirming district court's conclusion that statistical evidence, combined with coded directives "to engage in job actions," like "fly the contract," warranted a status quo injunction).

Atlas offered several examples to support its claim that the Union's conduct went beyond merely reminding pilots not to work sick. The day the Union provided its section 6 notice, the host of a CBA Chat told viewers he had called in sick because of a high fever, then pulled a hot water bottle from under his shirt. The Chat closed with this reminder: "It's your CBA. They signed it. You use it." J.A. 637. The Union was aware that expressly calling for a "sick out" would be "unethical" and might expose the Union to a large fine. *See* J.A. 636 (describing $40 million fine levied against another airline union for encouraging a sick out). But it did encourage pilots to be "all in," to SHOP, and to "fly the CBA." *E.g.*, J.A. 631, 650; Pls.' Ex. 51 at 3, No. 17-cv-1953 (D.D.C. Nov. 30, 2017), Dkt. No. 5-54. The Union directly connected the CBA, these coded terms, and the sick calls when it "commend[ed]" pilots for their "vigilance in holding up the provisions of our CBA" and

reminded them that, "in the midst of [this] period of increased friction and hostility, . . . make absolutely certain that you are fit for duty each and every time you report to work. Please, do not fly sick or fatigued. All In, Every Day." J.A. 774.

To be sure, Atlas's argument is not ironclad. It could not identify any specific example of an individual pilot who had abused the sick leave policy. *Atlas Air*, 280 F. Supp. 3d at 89. The fit between the Union's language and the pilots' conduct is not exact, as these communications relate to calling in sick, not calling in sick at the last minute. And, as the district court acknowledged, "[s]tanding alone," the claim that the Union encouraged pilots not to fly sick "might not carry the day." *Id.* at 90. But the district court found that specific examples and "more explicit language" were not necessary because, when viewed in context, "it is evident that at least some of the Union's exhortations were tied to the ongoing labor dispute." *Id.* at 90-91. That was not reversible error.

### 3. Open Time

Finally, we turn to overtime, known in this industry as "open time." Airlines use open time when both the primary and reserve crew are unable to fly as scheduled. Filling an open time slot involves calling individual pilots in order of seniority until Atlas finds someone willing to work that flight. Unfilled open time creates cascading delays because the airline must move pilots from other flights to cover these shifts. At its worst, it may take days to get back to the normal schedule. As such, although each pilot may choose whether to accept an available open time shift, Atlas relies on the assumption that most open time positions will be filled.

The district court found that Atlas presented sufficient statistical evidence to support its claim that, since the Union

served the section 6 notice, it has become more difficult to fill open time. In 2015, Atlas made an average of one-and-a-half calls to fill each open time assignment. J.A. 456 (Lee Decl.). In 2016, that number increased to over two calls per assignment, and in 2017, to over three. *Id.* at 457. Still, more assignments remained unfilled. From January 2015 to February 2016, about 2.5% of all open time assignments were not filled, and unfilled assignments never exceeded 5% in a given month. *See id.* at 459. Between March 2016 and August 2017, around 10% of total assignments were unfilled. *See id.* In eleven of those eighteen months, the unfilled rate exceeded 5%; in three months, it exceeded 20%. *Id.* As with sick leave, however, a statistically significant shift in open time did not occur immediately after the Union provided its section 6 notice in February 2016. *See id.* Furthermore, although the overall trend demonstrates an increase in unfilled open time, the statistics are not consistent from one month to the next. Between November 2016 and March 2017, for instance, the percentage of unfilled open time fluctuated from 11% to 42%, 5%, 0%, and 23%. *Id.*

The Union suggests that these changes resulted from a decrease in total open time and a decline in the desirability of those assignments. In support, the Union points to a purported 2015 policy change that required more pilots to "deadhead" on company aircraft to get to the location of their next assignment. Deadhead flights tend to be less direct, less comfortable, and less reliable than commercial flights. The Union also suggests that this change might have occurred because individual pilots chose to decline open time for personal reasons, such as a desire to spend more time with their families, or because they did not need the extra money.

The district court rejected these alternative explanations as "more supposition than evidence." *Atlas Air*, 280 F. Supp. 3d at 97. That was not clearly erroneous. The Union's expert, Mr.

Akins, was unusually equivocal about these ideas, emphasizing that they were "possible" or "may" explain these changes in behavior. J.A. 252-53 (Akins Decl.). He acknowledged that it is "counterintuitive" to expect that "the share of open trips uncovered would increase as open trips decreased." *Id.* at 253. We agree. We would naturally expect that, if there are fewer opportunities to earn extra income, more pilots would be interested in them. Furthermore, the Union did not offer any evidence to support its claim that Atlas's deadheading policy had changed. *See id.* at 252 (Akins Decl. stating he was "informed" of the deadheading policy shift but not providing supporting evidence or affidavits). Given the questionable logic of the desirability theory and the dearth of evidence supporting the deadheading theory, the district court did not err in accepting Dr. Lee's reasoned analysis over Mr. Akins's unsupported speculation.[2] Although the district court did not reject each theory of why an individual pilot might decline open time, the court adequately made clear that it credited Dr. Lee's conclusion that this change did not merely stem from a series of individual decisions.

Finally, the Union points to the temporal disconnect between the section 6 notice and the alleged change in behavior. As we said in our discussion of sick calls, large-scale

---

[2] On appeal, the Union gestures at two other arguments, both of which it forfeited. The idea that it is counterintuitive for pilots to decline premium pay to gain bargaining leverage was not adequately raised before the district court. *Haselwander v. McHugh*, 774 F.3d 990, 997 (D.C. Cir. 2014). And the Union mentioned only in passing that Atlas has the authority to decide whether to add a trip to a pilot's schedule or designate it as open time and did not explain why that might be important. *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . .").

behavioral changes do not always happen overnight. *Supra*, Part III.A.2. That is especially true when it means forgoing an extra benefit, like overtime pay, so it was not erroneous for the district court to conclude that the "precise temporal correspondence that the Union demands is neither required nor what one would reasonably expect to occur." *Atlas Air*, 280 F. Supp. 3d at 96. Moreover, although the amount of unfilled open time was not consistent from month-to-month, statisticians typically compare figures year-to-year or quarter-to-quarter. And the fact remains that, from 2015 to 2017, it took more phone calls to fill each open time slot, and more open time slots still went unfilled. Based on this, the district court did not improperly conclude that Atlas had carried its burden of proof.

Atlas presented sufficient evidence demonstrating that the Union encouraged pilots to act in this manner. Although some of these communications concerned the practice of accepting open time out of seniority order in violation of the existing CBA, *see* Union Br. 18-19, the vast majority did not. For example, when a pilot asked during a Crew Call whether "picking up open time flying harm[s] . . . [the Union's] ability to negotiate," Captain Kirchner explained that "[e]verything you do when you cut a corner on the CBA, when you go the extra mile for [Atlas], that just solidifies and helps them in what they are trying to do to us . . . and it prolongs the negotiation process." J.A. 721-22. He reminded pilots, "You are all watching a huge amount of open time. . . . [U]nfortunately some of our pilots are falling over backwards to help [Atlas] out of a jam . . . . Think what you do before you do it because you might be prolonging the agony" of "service failures, scheduling failures, etc." J.A. 735. The Executive Committee did explain that whether to fly open time is "a personal decision," J.A. 736-38, and clarified that the Union could not "reprimand" pilots who accepted open time flights, *see* J.A. 713, or "openly advocate [for] not picking up open time

flying," Pls.' Ex. 113 at 10, No. 17-cv-1953 (D.D.C. Nov. 30, 2017), Dkt. No. 28-15. But the Union's preferences were clear: "[I]f you don't fly open time, and that's a personal decision because you want to be with your family, and you don't want to help [Atlas] out, that's a great personal decision. . . . [I]t's just time for people to do what's right for the group, but do it on a personal basis." J.A. 737. In light of this anecdotal and statistical evidence, the district court did not err in enjoining the Union from encouraging pilots to decline open time.

B

Two final points warrant discussion. First, Atlas's September 2017 lawsuit was timely. RLA claims are subject to a six-month statute of limitations. *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 226 (D.C. Cir. 2000). If events in the six months leading up to the lawsuit are part of an ongoing slowdown campaign or would themselves constitute violations of the RLA's status quo requirement, however, the action is not time-barred. *ALPA*, 563 F.3d at 269-70 (ongoing slowdown); *see Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 (1960) (standalone violation). The statistical and anecdotal evidence that we have described sufficiently demonstrates that the Union was continuously violating the RLA in the six months before Atlas filed suit.

Finally, the Union claims that the injunction is overbroad in violation of the First Amendment and NLGA section 109. The district court enjoined the Union, its "officers, agents, employees, members employed by [Atlas], and all persons acting in concert with any of them . . . from authorizing, encouraging, permitting, calling [for], engaging in, or continuing any strike, work stoppage, sick-out, concerted refusal to volunteer for or to accept work assignments (including, without limitation, open time flights), slowdown

26

(including, without limitation, the existing SHOP and BOOT campaigns), or other self-help against [Atlas] relating to the dispute or disputes arising from the Section 6 notice." J.A. 156.

Such language is common in these types of injunctions, and presents no problem here. *See, e.g.*, *ALPA*, 563 F.3d at 259-60; *Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 883 F. Supp. 755, 765-66 (D.D.C.), *amended on reconsideration*, 899 F. Supp. 646 (D.D.C.), *and aff'd*, 72 F.3d 919 (D.C. Cir. 1995) (per curiam) (unpublished table decision). The Union protests that the district court erroneously enjoined lawful, protected individual and group activity. But the district court was only permitted to enjoin those "specific act[s] . . . expressly complained of in the [complaint]" and about which it made explicit factual findings. 29 U.S.C. § 109. As the complaint, language of the injunction, and the court's underlying findings reflect, this case is about whether the *Union* violated the RLA by encouraging pilots to jointly engage in actions designed to obtain leverage in the negotiations for an amended CBA. *See Atlas Air*, 280 F. Supp. 3d at 67. The injunction does not restrict the rights of *individual pilots* whose actions are independent of the Union, nor does it impermissibly prohibit lawful self-help activities that would not run afoul of the RLA. For example, it does not prohibit a pilot's personal decision to refuse an open time assignment. Rather, the injunction applies only to "persons acting in concert with" the Union and its officers in their efforts to obtain leverage in negotiations for an amended CBA. J.A. 156; *id.* (enjoining only the "concerted refusal to volunteer for or accept work assignments"); *see Concerted*, NEW OXFORD AMERICAN DICTIONARY 352 (2d ed. 2002) ("jointly arranged, planned, or carried out; coordinated"); *see also Concerted Action*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An action that has been planned, arranged, and agreed on by parties acting together to further some scheme or cause,

so that all involved are liable for the actions of one another."). That complies with the First Amendment and NLGA.

## IV

In sum, the district court had jurisdiction to enter a status quo injunction in this major dispute, and did not abuse its discretion in enjoining this conduct. The judgment of the district court is affirmed.

*So ordered.*